MORRIS JOSEPH, PLAINTIFF-APPELLANT, v. PASSAIC HOSPITAL ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, *ET AL.*, DEFENDANTS-RESPONDENTS.

MORRIS JOSEPH, PLAINTIFF-APPELLANT, v. JOHN C. BARBOUR, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued February 18, 1958—Decided April 28, 1958.

*Messrs. Harry Green* and *Max Eisenstein* argued the causes for appellant (*Mr. Gordon N. Litwin,* on the brief; *Messrs. Eisenstein & Eisenstein,* attorneys).

*Messrs. Walter D. Van Riper* and *Charles E. Villanueva* argued the causes for respondents (*Messrs. Van Riper & Belmont,* attorneys).

The opinion of the court was delivered by

HEHER, J.   We certified, *sua sponte,* plaintiff's pending appeal in the Appellate Division of the Superior Court from judgments severally dismissing his complaints in two

separate proceedings for an injunction and "general and compensatory damages."

The first action was brought June 5, 1954 in the Chancery Division of the Superior Court to enjoin the Passaic Hospital Association, a body corporate, its Board of Governors and executive officers, and the Medical Staff of the Passaic General Hospital, alleged to be an "unincorporated association, associated with the Passaic General Hospital," and the Hospital's director, all of whom were joined as defendants, from "interfering with the right of plaintiff," a licensed physician and surgeon, "to have private patients admitted into the Passaic General Hospital," a *"quasi-*public institution" under the control and operation of the defendant corporation, "and to treat his private patients" there, and to reinstate plaintiff "as a member of [its] Emeritus Staff" and "to such status as he may have enjoyed prior to the [adverse] action of the Board of Governors on February 15, 1954," of which more hereafter.

The second action was begun August 6, 1954 in the Law Division of the Superior Court against the individual members of the Board of Governors, the Medical Board and the Medical Staff and employees of the Hospital Association, to recover damages for conspiracy "to destroy plaintiff's profession as a medical doctor or surgeon and his character and reputation for ethical conduct, honesty and integrity in the practice of medicine and surgery," and "to make and instigate false charges against him for improper and illegal practices and for alleged violations of codes of ethics of * * * medical organizations" and the Hospital's rules and regulations, to the end of "bringing about his expulsion from [the] hospital" and thereby to still his criticism of members of its Medical Staff "for fee-splitting, ghost surgery, unnecessary operations and other unapproved and unethical medical practices condemned by [specified] medical organizations," and thus to deprive him, as an "Emeritus member" of the Hospital's Medical Staff, of the "opportunity of practicing surgery" and "to operate on patients in [the] hospital and practice his said profession and specialty."

The several answers to these actions pleaded, by way of separate defenses, that plaintiff "served as a member of the [Hospital] Staff at the will of the Board of Governors"; it was "completely within the discretion" of the Board of Governors "as to whether or not the plaintiff should be appointed either to its Medical Staff or to the Emeritus Staff"; and in refusing "reappointment" to plaintiff the Board "acted in good faith, within its discretion, and in the best interests of the administration of the Hospital"; also that the Hospital is not a *"quasi*-public institution," but rather "a privately operated and conducted hospital."

In the Chancery proceeding, a summary judgment for defendants on the pleadings, 35 *N. J. Super.* 450 (*Ch. Div.* 1955), was reversed by the Appellate Division, 38 *N. J. Super.* 284 (*App. Div.* 1955). The holding there was, Clapp, S. J. A. D., that "the allegations of the complaint setting forth a failure to give plaintiff the hearing due him under the by-laws—taken in conjunction with the allegations charging certain defendants with malice in connection with his failure of reappointment or removal—clearly make out a cause of action,"—a cause of action "proprietary in nature," resting "on an allegedly malicious impairment of a property right—the right of the plaintiff to earn a livelihood in his profession and to secure the economic advantages accorded to him pursuant to the by-laws." And it was there observed that the parties had not dealt with the question whether the remedy "lies through a mandatory prerogative writ proceeding for reinstatement," or whether there is a remedy "through an injunction," but the point was not pursued. We denied certification. 20 *N. J.* 535 (1956).

Upon the remand, the actions were consolidated and tried in the Law Division of the Superior Court, without a jury by consent.

At the close of the plaintiff's case, the Chancery action was dismissed on the ground that plaintiff's "membership on the [Hospital's] medical staff terminated, under [the last] appointment, December 31st, 1953," and he "had no right to be reappointed"; "[h]is reappointment rested within

the sound discretion of the Board of Governors"; under the Association's Constitution, "the final responsibility for reappointment [rests] with the Board of Governors," and if the By-laws of the Medical Staff be deemed applicable, they "also say that the action of the Board of Governors * * * is final, whether or not the man is given a hearing": and assuming plaintiff's desire for a hearing by the Board of Governors, communicated to the Board, the refusal of the Board "to reappoint him to the medical staff was final," and at most the failure to accord him a hearing was "a mere irregularity." Here, it was pointed out, as a circumstance to the same end, that plaintiff "submitted his case" to the Hospital's Joint Committee, and "took part in its deliberations without objection, although he voiced his desire to be heard by the Board of Governors."

And there was a further holding that the court "cannot interfere in the internal management of a corporation, except in cases of fraud, bad faith, breach of trust, or gross mismanagement, or * * * where the acts of the Board of Governors would be *ultra vires*"; and there was none such here, simply a "formal irregularity in the execution of the [Board's] powers." Reference was made to the action of the Medical Board, December 15, 1953, recommending that plaintiff "be temporarily removed from the [Hospital] Emeritus Staff, subject to action by the Board of Governors," also to the "report of the Audit Committee which found that [plaintiff] had failed to follow the rules and regulations of the surgical practice in the hospital," and the "letter from the Medical Society" as to certain complaints made by plaintiff to the "Medical Society about the charts which were the subject of" the Audit Committee's report, then before the Medical Board, all of which had been laid before the Board of Governors: and it was found that "those reports before the Board of Governors" sufficed to support the Board's refusal to "reappoint" plaintiff. It was said that, even assuming "some evidence of bad faith," where the "failure to reappoint is capable of two constructions, one which is honest and in good faith," it is to be presumed

that "the action of reappointment was based upon the reports before the Board of Governors, and that it was done in good faith."

The judge concluded that the exclusive remedy to enforce plaintiff's asserted "membership" or "right to reappointment" was by a proceeding in lieu of *mandamus,* and such relief was barred by *R. R.* 4:88–15.

And the action at law for damages was dismissed as involving "an act * * * done in good faith and for valid reasons and proper motives" which stands until "declared illegal by a proceeding in lieu of a prerogative writ," and is not subject to collateral attack, and withal sustained by the presumption of good faith unrebutted by evidence of "malice, conspiracy or other wrongful acts" by the Board of Governors, the Joint Committee, or the Medical Board or the individual defendants, although two of the latter were guilty of slander, which "is not [the] wrong which is the subject of this suit."

## I.

■ In the holding that under the Hospital Association's Constitution and the By-laws adopted by the Medical Staff, the action of the Board of Governors in refusing reappointment to an emeritus member of the Hospital's Medical Staff "is final, whether or not the man is given a hearing," the trial judge fell into error.

The Hospital Association was incorporated in 1892 under *L.* 1877, *c.* 103. Its Constitution declares its object to be "the establishment, support and management of an institution for the care, cure and nurture of sick and injured persons of any creed, nationality or color," and the establishment, maintenance and operation of "a training school for nurses." To serve these purposes, it operates the Passaic General Hospital, supported by patients' fees and charitable donations, including an annual payment of $18,000 by the City of Passaic for the care and treatment of indigent residents.

The Association's Constitution, Article III, section 1, provides for a voting membership comprising persons who make an annual payment of $25 or more, and a non-voting associate membership for those who make an annual payment less than that sum.

Article VIII, section 1, establishes a "Medical Board, consisting of seven members, of whom six shall be selected from the Medical Staff and one shall be the President of the Medical Staff," empowered to adopt "rules and regulations" subject to the approval of the Board of Governors, not inconsistent with the Constitution, who shall be, section 2, "responsible to the Board of Governors for the professional care of all patients, and * * * shall, therefore, direct and control the medical and surgical practices of the Hospital in all their branches," and "shall recommend to the Board of Governors annually, prior to the December meeting, the physicians to constitute the Medical Staff for the ensuing calendar year."

Section 5 of Article VIII provides that the Medical Board "shall appoint three of its members who shall meet with three representatives of the Board of Governors and the Director of the Hospital for the purpose of discussing matters concerning the Hospital service and to make such recommendations as they may decide upon to the Board of Governors."

Section 6 of Article VIII makes provision for "an organized medical staff composed of qualified physicians privileged to work in the Hospital and to serve the Hospital in the professional care of its patients," to be appointed by the Board of Governors "annually at the December meeting," "for a period of one year or until the end of the calendar year of the Hospital." The Medical Board "shall recommend to the Board of Governors the membership of the Medical Staff with the assignments of service," but "Final responsibility for appointments or cancellation of appointments rests with the Board of Governors." And the Medical Staff so

constituted "shall be divided into the following types of membership: Emeritus, Consultant, Senior Attending, Associate Attending, Assistant Attending, Clinical Assistant."

Section 8 of Article VIII authorizes the Board of Governors to appoint a "Courtesy Staff" of qualified physicians privileged to treat their patients in the Hospital; and Section 11 of the same Article provides for the automatic termination of the "active service" of a member of the Medical Staff at the age of 65, "at which time such member shall be automatically appointed to the Emeritus Staff," and voluntary retirement at the age of 60, "eligible for election to the Emeritus Staff," of which section 6A of Article II of the By-laws, to be set forth *infra,* is its counterpart. Section 8, *supra,* also provides for removal of any member of the Medical Staff or the Courtesy Staff, at a regular or special meeting, by a vote of three-fourths of the Board of Governors present, "after a conference between representatives of the Medical Board and the Board of Governors," and after a hearing if the staff member "so desires." This latter provision obviously has reference to removal during the year for which the appointment was made, as we shall see.

The "Medical Staff By-laws" ordain, Article II, section 1, that the Medical Staff "shall be composed of Physicians and Surgeons elected annually by the Staff, whose election shall, upon the recommendation of the Medical Board, be presented to the Board of Governors for appointment to serve the hospital in the professional care of its patients"; the Staff, section 2, is to be "divided into the * * * types of membership" provided for in the cited provision of the Constitution.

Thus, the emeritus division is a component of the Medical Staff; and the related terms of the Constitution and the Medical Staff By-laws are to be read in the context of this basic article. The By-laws were ratified by the Board of Governors, and thereby became a constituent part of the Association's elemental law.

The By-laws provide, Article II, section 6, under the heading "Terminations and Removals," in terms following:

"A. The active service of any member shall terminate automatically on his sixty-fifth birthday, at which time said member shall automatically be appointed to the Emeritus Staff; and any member may voluntarily retire at the age of sixty years at his own request, and may be eligible for election to the Emeritus Staff.

B. Appointments to the active Medical Staff shall be made by the Board of Governors on recommendation of the Medical Board on an annual basis, and subject to review each year by the Governors. Before a man fails of reappointment, he shall be given an opportunity to be heard by the Board of Governors if he so desires. In all such matters, the Board of Governors, through the Joint Committee, shall properly confer with the Medical Board, but the action of the Board of Governors shall be final."

On November 22, 1952, plaintiff, then 64 years of age, tendered his "resignation from the [Hospital's] active staff," stating that the imminence of the "Emeritus status" made it unwise to "reorganize [his] surgical service for the short time remaining," and so he would accept the emeritus rank; and he was accordingly elected to the Emeritus Staff. He was thereby "relieved of all the ward service" and the "routine duties that pertain to the hospital distinctly as such"; no duties would be assigned to him except in a "national emergency" (By-laws, Article II, section 2-F) ; but, as found by the Appellate Division, 38 *N. J. Super.* 284, as a member of the Emeritus Staff he was entitled in his private practice "to the privileges of the [Hospital's] active staff," on which he had served for more than 30 years. He remained on the Emeritus Staff until February 16, 1954, when the president of the Association advised him by letter that "[a]t the regular meeting of the Board of Governors of the Passaic General Hospital" held the preceding day, he was "not reappointed to the Medical Staff." He had reached the age of 65 on the prior February 11; and on December 11, 1953, his name appeared on the Hospital's approved Emeritus Staff for the year 1954.

Apparently, the action was prompted by a complaint relating to hospital practices and procedures made by plaintiff to the Judicial Council of the Medical Society of New Jersey. And ill-feeling had been engendered by policy differences and controversy over hospital usages. At a special

meeting of the Hospital's Medical Board held December 15, 1953, to consider the complaint of the Medical Society, it was decided to recommend to the Board of Governors that plaintiff's name "be temporarily removed from the [Hospital's] Emeritus Staff." On February 16, 1954, a patient of plaintiff, it is shown, was refused admission to the Hospital for an operation, notwithstanding prior arrangements made to that end; the patient was informed that "Doctor Joseph is no longer with us." There can be no doubt that plaintiff was thereafter refused the use of hospital facilities accorded to members of the Emeritus Staff presumably in recognition of their proven medical and surgical skills, either or both, and their past professional service to the Hospital and its patients, a course of action that in right reason and justice could not be taken unless reasonably deemed essential to the welfare of the Hospital and its professional and administrative efficiency, a determination to be made in good faith after a hearing on notice to the staff member subjected to the disciplinary action.

A hearing on notice is of the essence of the cited provisions of the Constitution and By-laws. And this requirement is not confined to removal or expulsion of staff members. The "active service" of a staff member shall cease on his 65th birthday, when the member "shall automatically be appointed to the Emeritus Staff"; a member may voluntarily retire at the age of 60, "and may [then] be eligible for election to the Emeritus Staff"; and "Before a man fails of reappointment, he shall be given an opportunity to be heard by the Board of Governors if he so desires."

This latter provision applies to Emeritus Staff members; for Article VIII, section 6, speaks of an "organized medical staff" composed of qualified physicians "privileged to work in the Hospital and to serve the Hospital in the professional care of its patients," inclusive of the emeritus "type of membership," to be appointed annually by the Board of Governors. The requirement of a hearing before "a man fails of reappointment" is quite clearly intended to protect the staff member against arbitrary, capricious and oppressive

action involving his professional qualifications, standing and prestige and the opportunity and facilities for continued service, and for the good of the Hospital as well; and there is no discernible reason for differentiating between "active" and "emeritus" staff members in this regard. Such a distinction would be illusory. It is the obvious reason and spirit of the words of the Constitution and By-laws, taken as a whole, that controls, not the strict or literal sense of particular terms taken out of context. The Constitution and By-laws were so construed in this case by the Hospital's Joint Committee.

The "hearing" thus provided was not designed to be an empty gesture—a formal ceremony utterly devoid of essential meaning. It is manifestly a measure to serve the mutual interests of the Hospital and its staff. A "hearing" without a standard of action would be vain.

Those bound together in the common enterprise have reciprocal rights and duties laid down in the Constitution and By-laws and such as are inherent in the nature of the undertaking; and judicial interposition may be had to avert unreason and unconscionable and excessive action, such as would offend against natural justice. Compare *Cameron v. International, etc., Union No. 384,* 118 *N. J. Eq.* 11 (*E. & A.* 1935); *Walsche v. Sherlock,* 110 *N. J. Eq.* 223 (*Ch.* 1932); *Gaestel v. Brotherhood of Painters, etc.,* 120 *N. J. Eq.* 358 (*Ch.* 1936); *Central Bus Operators v. Central Avenue Bus, etc.,* 127 *N. J. Eq.* 144 (*Ch.* 1940), affirmed 128 *N. J. Eq.* 177 (*E. & A.* 1940); *Walsh v. International Alliance, etc.,* 22 *N. J. Misc.* 161 (*Ch.* 1944), affirmed 136 *N. J. Eq.* 115 (*E. & A.* 1945). See *Chaffee, "Internal Affairs of Associations Not for Pecuniary Profit,"* 43 *Harv. L. Rev.* 993 (1930); *"Protection of Members in Voluntary Associations,"* 37 *Yale L. J.* 368 (1927). The Association's Constitution and By-laws are essentially conventional; the compact derives from the common consent of the parties, and is limited accordingly. *Leeds v. Harrison,* 9 *N. J.* 202 (1952).

We are not now concerned with the general rule invoked by defendants that the exclusion of a physician from practice in a "private hospital" rests "within the discretion of the managing authorities." The action taken here is null for want of a hearing in accordance with the Association's basic law.

Nor was there a waiver by plaintiff of "any right to a hearing on his reappointment to the Emeritus Staff."

The Joint Committee tendered a hearing to plaintiff on the "question of [his] reappointment to the Medical Staff"; he appeared before that committee at the time designated and, in the course of the proceeding, he demanded a hearing before the Board of Governors in keeping with the Constitution and By-laws, stating he was under the impression that he was appearing before the Board of Governors: and the argument is now made that since plaintiff "had stated all that he desired to state before the Joint Committee on February 1, 1954" and had made no later request for a hearing on the question of his reappointment for 1954 "or any succeeding year," the failure to afford a hearing before the Board of Governors "was a mere irregularity," and, at all events, the question of reappointment to the Emeritus Staff for the year 1954 is now moot.

The Joint Committee did not have jurisdiction to hear the issue, an acknowledgment made by that Committee at the time; plaintiff insisted upon a hearing by the Board of Governors, and so there was no voluntary submission by him to the Committee on the question of reappointment; and, absent the stipulated hearing by the Board of Governors, the failure of reappointment did not terminate the emeritus relation.

## II.

Defendants' final point as to the chancery action is that *mandamus* "is the only proper remedy to effect the restoration to membership" in a private corporation of one wrongfully removed, and action to "review the failure of reappoint-

ment made by the Board of Governors" is now barred by *R. R.* 4:88–15(*a*), providing that a proceeding for review, hearing and relief in lieu of prerogative writs shall be commenced within 30 days of the accrual of the right to such review, and not thereafter, save in certain cases not here pertinent.

In the modern view *mandamus* is not treated as a prerogative writ except when invoked in matters of direct concern to the public, but rather as an ordinary writ of right to remedy official inaction. In New Jersey it is an extraordinary remedial process to compel the performance of a specific act or duty; and it ordinarily involves the exercise of a sound discretion—a legal rather than an equitable remedy, still extraordinary in nature, controlled to some extent by equitable principles. But it cannot be utilized to enforce purely equitable rights. The applicant's "equitable right" is not triable on *mandamus;* for thereby the writ would be made to serve the purpose of an ordinary suit, contrary to the settled rule that *mandamus* may not be used to adjudicate a disputed right for which an ordinary action affords a remedy "equally adequate and complete." *Beronio v. Pension Commission of City of Hoboken,* 130 *N. J. L.* 620 (*E. & A.* 1943); *Switz v. Middletown Twp.,* 23 *N. J.* 580 (1957).

An "irregular removal from connection with a private corporation will warrant the use of the writ of *mandamus* to effect a restoration of the expelled member to his corporate rights." *Sibley v. Board of Management of Carteret Club of City of Elizabeth,* 40 *N. J. L.* 295 (*Sup. Ct.* 1878). See also *Pirics v. First Russian Slavonic Greek Catholic Benevolent Society,* 83 *N. J. Eq.* 29 (*Ch.* 1914); *Zeliff v. Grand Lodge of New Jersey Knights of Pythias,* 53 *N. J. L.* 536 (*Sup. Ct.* 1891); *Stahl v. Romanian Young Men's Association,* 77 *N. J. L.* 380 (*Sup. Ct.* 1909). But there is no reason in principle which renders this extraordinary judicial province exclusive when there is an available adequate remedy in equity, certainly not now that the

administration of law and equity and the extraordinary jurisdiction exercised by the prerogative writs are merged in the Superior Court.

In the view of some courts, an available equitable remedy is not *per se* good ground for refusing the writ of *mandamus,* although it is a consideration bearing upon the exercise of the discretion thus invoked. *Bassett v. Atwater,* 65 *Conn.* 355, 32 *A.* 937, 32 *L. R. A.* 575 (*Sup. Ct. Err.* 1895); *Baltimore University v. Colton,* 98 *Md.* 623, 57 *A.* 14, 64 *L. R. A.* 108 (*Ct. App.* 1904); *State ex rel. Grady v. Chicago, M. & N. R. Co.,* 79 *Wis.* 259, 48 *N. W.* 243, 12 *L. R. A.* 180 (*Sup. Ct.* 1891). But other jurisdictions hold that *mandamus* is available only when necessary to supply the deficiencies of ordinary legal processes, and the writ may be refused if there be an efficient remedy in equity. *United States ex rel. Girard Trust Co. v. Helvering,* 301 *U. S.* 540, 57 *S. Ct.* 855, 81 *L. Ed.* 1272 (1936); *George S. Chatfield Co. v. Reeves,* 87 *Conn.* 63, 86 *A.* 750, *L. R. A.* 1916D, 321 (*Sup. Ct. Err.* 1913); *State ex rel. Moyer v. Baldwin,* 77 *Ohio St.* 532, 83 *N. E.* 907, 19 *L. R. A., N. S.,* 49 (*Sup. Ct.* 1908); *Garraway v. State,* 184 *Miss.* 466, 184 *So.* 628, 185 *So.* 803 (*Sup. Ct.* 1939); *Parrotta v. Hederson,* 315 *Mass.* 416, 53 *N. E.* 2d 97 (*Sup. Jud. Ct.* 1944); *Burkett v. Blaisdell,* 137 *Me.* 200, 17 *A.* 2d 460 (*Sup. Jud. Ct.* 1941).

It cannot be that the jurisdiction commonly exercised in equity, *e. g.,* specific performance and injunctive relief to that end, is excluded by the remedy of *mandamus,* which by its very nature is an extraordinary writ. It is generally held that equity may by injunction safeguard and enforce the right of a physician to treat his own patients in a hospital, and to pass upon the validity of claimed amendments to the hospital's constitution and by-laws in the adjudication of the right. *Stevens v. Emergency Hospital of Easton,* 142 *Md.* 526, 121 *A.* 475 (*Ct. App.* 1923), where the hospital staff was enjoined from interfering with the plaintiff's right to practice surgery in the defendant hospital. See also *Levin v. Sinai Hospital,* 186 *Md.* 174, 46 *A.* 2d

298 (*Ct. App.* 1946); and the Annotation in 24 *A. L. R.* 2*d* 850, 862.

■ Moreover, where *mandamus* is sought to enforce a continuing right, the limitation of *R. R.* 4:88–15(*a*) is not applicable. *Yanuzzi v. Mayor and Council of Borough of Spring Lake,* 22 *N. J.* 567 (1956); *Lettieri v. State Board of Medical Examiners,* 24 *N. J.* 199 (1957).

And the question of the propriety of the remedy was not raised here until after the entry of the judgment of reversal in the Appellate Division, a year and a half after the commencement of the equity suit.

## III.

The action for damages is grounded in the principle exemplified in *Louis Kamm, Inc., v. Flink,* 113 *N. J. L.* 582 (*E. & A.* 1934). It is directed against the individuals constituting the Association's "governing bodies," as the trial judge expressed it, and not the Association itself, either for breach of contract or otherwise. Counsel said at the trial: "I am not suing the hospital association for damages." And this seemed to be his position on the oral argument, although it is argued on the brief that "illegal removal" and "failure of reappointment" entitled plaintiff to damages from the Association itself for breach of contract. But such is not the issue made by the action at law.

The gravamen of the complaint in the law action for damages is, as we have seen, conspiracy "to destroy plaintiff's profession and his character and reputation for ethical conduct, honesty and integrity in the practice of medicine and surgery," by making unfounded charges of "illegal practices" and transgressions of accepted ethical standards, and thereby to accomplish his "expulsion from [the] hospital" and deprive him of the emeritus status; and the proofs provide no basis for this hypothesis to take the case to the jury.

■ The failure of the Board of Governors to accord plaintiff a hearing is not *per se* sufficient to sustain the

pleaded cause of action. It does not in itself support the inference of "malicious interference" with a contractual relation, as plaintiff would have it. Presumably, it was a mistaken exercise of power devoid of malice and bad faith; and the burden of persuasion was the plaintiff's. This is elementary; the affirmative of the issue cannot be made to rest upon pure conjecture. The subjective element of malice must needs have a tangible basis in the circumstances. A case is made for the jury only when the facts and circumstances are reasonably susceptible of the claimed inference; and this is not so here. There was no evidence fairly tending to support the charge of conspiracy. There was acrid controversy as to policy and procedure which gave rise to deep feeling and emotional display at times; but these subjective reactions are a far cry from conspiracy to destroy plaintiff's professional good name and fame. These directors had the responsibility of hospital management; and while this superintendency cannot be made the cloak for a wilful and malicious injury to others, it is a circumstance that is necessarily to be regarded in assessing the conduct that is declared to be a conspiratorial endeavor to do personal harm under the guise of institutional welfare.

It is said in argument, citing *Louis Kamm, Inc., v. Flink,* *supra:* "From the conspiracy may be drawn the inference of a malicious intent to inflict injury, which would be impossible in the case of one acting without concert with others"; the "combination implies the intentional causing of loss or damage without justifiable cause"; and while "combination is not an essential element, it may serve to show the unlawful motive and purpose."

But the argument begs the question. There is no rational ground in the evidence for the inference of a conspiracy to inflict loss or damage without justifiable cause.

Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as "a mere preponderance of probabilities, and, therefore, a sufficient basis for decision." *Jackson v. Delaware, L. & W. R. Co.,* 111 *N. J. L.* 487 (*E. & A.* 1933).

As there said, it need not have the quality of certainty, but it must be a presumption grounded in reason and logic; mere guess or conjecture cannot be substituted for legal proof. The burden of persuasion is not sustained unless the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind. It is not easy to lay down with precision the line of demarcation between a just and reasonable inference and mere conjecture or surmise. The accepted standard of persuasion for the triers of the facts is that the determination be probably founded in truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is "the feeling of probability which it engenders." *Bornstein v. Metropolitan Bottling Co.*, 26 *N. J.* 263 (1958), citing *Wigmore on Evidence* (3d ed.) § 2498. See *Sivak v. City of New Brunswick*, 122 *N. J. L.* 197 (*E. & A.* 1939).

We hold as a matter of law that the pleaded conspiracy may not reasonably be inferred from the evidence here adduced; and so the action was properly dismissed.

And there is no showing that the alleged defamatory statements ascribed to the defendants Hartman, Zulauf, Provisor and Randazzo were made in the pursuit of a conspiracy. As the trial judge said, slander in the given circumstances is not the subject matter of this action.

In this view, we have no occasion to consider the defense of absolute privilege for "alleged defamatory statements" made "in the course of a *quasi*-judicial proceeding."

The judgment in the equity suit is reversed, and the judgment dismissing the law action for damages is affirmed; and the causes are remanded for proceedings accordingly.

*For affirmance—Law Action*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—None.

*For reversal—Chancery Action*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—None.