50 N.J. Super. 538 (1958)
143 A.2d 229
ANTHONY GENOVAY, PLAINTIFF-APPELLANT,
v.
CHARLES FOX, TRADING AS WHITE HORSE BOWLING ACADEMY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1958.
Decided June 16, 1958.
*542 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. George Pellettieri argued the cause for plaintiff-appellant (Messrs. Pellettieri and Rabstein and Mr. Lewis C. Stanley, attorneys).
Mr. Richard J.S. Barlow, Jr., argued the cause for defendant-respondent (Messrs. Lenox, Giordano and Lenox, attorneys).
*543 The opinion of the court was delivered by CONFORD, J.A.D.
The principal questions posed for resolution on this appeal are these. To what extent does the proprietor of a combination bowling alley-bar owe his business invitees the duty of securing the premises against the hazard of entry by an armed bandit and consequent injury at the hands of the intruder in the course of a holdup of the proprietor? After such an entry has been effected is the proprietor under a duty to conduct himself in such a manner as to avoid inducing or encouraging resistance to the bandit by those present if resistance reasonably appears to entail a heightened risk of serious injury or death to one or more of those present? Assuming such a duty, was there sufficient evidence here of defendant's breach of duty to warrant submission of the liability question to the jury? There are collateral questions, the more important relating to proximate cause and contributory negligence.
On the night of April 21-22, 1955 defendant was the owner of the White Horse Bowling Academy on Bordentown Road, Hamilton Township. The enterprise included a licensed bar for the sale and consumption on the premises of alcoholic beverages. At about 3:15 A.M. a masked gunman gained entry into the building. Defendant Fox, owner of the place, four of his employees and six patrons were in the bar section of the premises, talking, some drinking beer. In the course of the ensuing holdup, one of the patrons, James Aversano, attempted to disarm the bandit but was shot and mortally wounded in the effort. Plaintiff, a close friend of Aversano, went to his aid and was also shot by the gunman, sustaining the serious injuries for which he now sues for compensation in damages.
The basis for the action is negligence on the part of the proprietor, both in failing to secure the premises against unlawful entry and in encouraging and inciting activity conducive to gunfire after the robber's entry, either by design or imprudence. At the close of the plaintiff's case the trial judge granted a motion for involuntary dismissal, resting his action solely on a lack of evidence showing a "proximate *544 connection between any acts of the defendant and the injuries sustained by this plaintiff." The judge concluded that the acts of Aversano and the plaintiff were done "independently" of the defendant and he implied that these were intervening factors which broke the chain of legal causation between any negligence of the defendant and the damage sued for.

I.
In reviewing the factual record in this procedural context we are, of course, guided by the precept that the plaintiff is entitled to have the sufficiency of his case appraised on the basis of the most favorable testimony introduced on his behalf along with all favorable inferences which a jury might properly draw therefrom, resolving in his favor all matters of credibility. Martin v. Bengue, Inc., 25 N.J. 359, 362 (1957). We therefore recite the facts we deem material in their most favorable relation to plaintiff's projected theories of recovery, but also allude to some other aspects of the proofs in the interest of contrast and background.
Defendant's business premises are divided roughly into two sections. The front portion, facing the road, consists of a barroom which includes booths, a dance floor and snack bar. The main entry door leads directly into the bar. The bowling alleys take up the rear portion of the premises. There are two doors giving direct access between the bar and the alleys, but there are two other doors for direct entrance to the alleys from the outside, and still two other doors from which entry can be had from the outside to a corridor leading to either the bar or the bowling alleys. There are several windows in the bowling alley section of the structure. To the right (looking from the front) of the bowling alleys is a 10' x 10' office room wherein was situated a very large safe in which defendant kept certain moneys. There were six cash registers on the premises.
The bar was customarily closed at 2:00 A.M., the legal closing hour, but closing time for the bowling alleys was *545 indeterminate, varying from 2:00 A.M. to 6:00 A.M., depending on the volume of business. The most frequent closing hour was about 4:00 A.M. Thursday was a "slow" bowling night (April 21, 1955 was a Thursday), and the alleys generally closed between 2:00 A.M. and 2:30 A.M. on that night. Defendant testified (on depositions which plaintiff read into evidence) that he had read in the newspapers of increased armed robberies in the county, occurring more frequently in the late night hours than by daytime. Defendant had never sustained an armed robbery previously but there had been surreptitious thefts of money and property on occasion by employees. A combination porter-night watchman was employed, who usually came to work between 12:00 midnight and 12:30 A.M., and whose duties included locking up the bar after closing, cleaning up the bar, and, after the bowling alleys were vacated, checking to see that all the doors and windows in the premises were locked.
Plaintiff arrived at the premises at about 2:20 A.M., expecting to bowl with his close friend, James Aversano, and others. The doors were locked, but he was recognized by the bartender and admitted through the front door. The few bowlers, including defendant himself, were finishing their last game. At about 2:35 A.M., the bowling concluded, and all the bowlers, together with defendant and his employees, Papp, the manager, Fuccello, the watchman, Cimore, the bartender, and Potzer, a mechanic, congregated in the bar. The defendant asked the men "to have a drink." He himself and at least one of the group had beer. Fuccello was also drinking beer, but as part of his "lunch." The defendant stayed behind the bar until the advent of the gunman. Fuccello had not yet gone out to the alleys to check the doors and windows. By that time Papp was supposed to have "locked up" the entire building. Additional customers would be admitted through the front door, but only if they were known to the management. A front door alarm was in operation, set to ring whenever there should be a front door entry. When those then in the place left, no more customers were to be admitted. Another bowling *546 customer, coming to inquire about a bowling ball, came in about 3:00 A.M. with a companion, and they joined the group in the bar in general conversation about an impending bowling tournament. There were thus 11 men in the room.
At about 3:15 A.M. the left-side door between the alleys and the bar opened and the bandit entered. He carried a gun in each hand and a bandanna covered his face from the nose down. He wore a ski cap and a trench coat which were wet from the rain. The defendant and some of the others laughed when he said, "This is a stick-up. Who is the boss?" thinking someone was playing a joke. All soon realized the intruder meant business, and the defendant identified himself. The bandit said, "I want you to open the safe in the other room," to which defendant replied, "What safe?" and "sort of laughed." This evoked the rejoinder, "You know what safe I mean, in the other room. Get going." There is undenied testimony that defendant told the group, in effect, that his money was insured. Defendant testified he also said, "Let's be calm about this," and, "We want no trouble," or, "Let's not have no trouble because there's so many of us in here." From other testimony, however, the jury could have concluded the latter remarks were not made. Defendant testified that as soon as he realized a holdup was actually in progress he felt the situation was dangerous "because all these men were friends of mine and they are liable to do something for me that might be very dangerous to all of us."
The gunman directed the entire group to precede him out of the right-side bar door leading to the alleys and thence to the room where the safe was kept. Vogler, one of the bowlers, protested sharply when the thug poked a gun in his back to hurry him along. Papp, in the corridor with Fuccello before the bandit left the bar, told Fuccello to sneak into the men's toilet, and the latter did so, taking one of the other men with him. They locked the door and escaped through a window to summon the police. The gunman yelled for the fugitives to return, and then said to the remaining group, "We have still got time to do this *547 before the cops get here. I know one got away, get going and nobody will get hurt." Defendant testified he realized the danger in the situation had increased with the escape of the two men.
The remaining nine men were herded into the office where the safe was, a room about ten feet square. The entrance was close to the right corner of the room (looking in the door). The large safe stood against the wall to the left of the door. There was a closet on the opposite (far) wall. The gunman stood just inside the door, Aversano to his right, and the others ranged about the small room. The gunman told Fox to open the safe. On the first try Fox missed the combination. The gunman became angry, remarked again that one man had escaped and told him to hurry up. Fox opened the safe, took a box of money out of it, turned around with his back to the bandit, walked across the room and laid the box on the closet on the opposite side of the room. While this was going on the gunman exchanged angry words with Agabiti, one of the group, who he thought was staring at him, and he threatened to kill the man if he did not look out the window. Aversano told the gunman not to get "trigger happy," that "nobody was going to do anything."
Fox then made a remark to the gunman which has been worded in various ways by the witnesses. Plaintiff testified Fox said "there was still more money in the safe and if he [the gunman] wanted it he would have to go and get it * * *"; that "the box was bolted to the safe." A written statement to the police by the manager, Papp, on the night of the occurrence (Papp was deceased at the time of trial) was to the effect that Fox said, "Do you want to look in the safe and see what you want?" The witness Terlicky (a bowler) said that the gunman asked for the rest of the money after Fox put the box on the closet and that Fox responded, "There is more in there, but it is bolted down. I can't give you that. You can go in and take it yourself if you want to." This same witness said the gunman wanted Fox to "hurry up with the extra money" but that Fox "kind *548 of slowed down a little bit." In any case, while the gunman hesitated a moment or two after Fox' last remark, Aversano suddenly struck or tackled the gunman, the two went out of the door and a shot rang out from the alleys. Immediately Genovay, the plaintiff, from the far side of the room, ran out of the door, and there, seeing the gunman "over Jimmy [Aversano] and it looked like he was going to shoot him again," jumped on the gunman and was himself seriously wounded by gunshot. The bandit ran out of the front door and escaped. Aversano died later at the hospital. The lapse of time between the entry of the bandit and the shootings was between five and ten minutes.
It may be material to note that Aversano and Genovay were both World War II veterans, aged respectively 38 and 35. Genovay had been in the Marine Corps. As already stated, they were close friends and bowling companions, apparently to defendant's knowledge.
An inspection of the premises after the holdup showed all doors and windows locked with the exception of one window on the left side of the bowling alley section of the building, which was unlocked and open about an inch.

II.
As indicated above, plaintiff projects his case on two general hypotheses of defendant's tortious conduct, one based on events prior to the appearance of the gunman, the other on those subsequent. As defendant justifies the result at the trial on the contentions both of absence of duty and lack of proximate cause, as well as the other defenses mentioned above, we must consider the duty phases of the case before inquiring into whether the trial judge was justified in concluding there was no proximate connection between defendant's conduct and plaintiff's injury. We turn our attention first to the theory of duty on the part of the defendant to safeguard the premises in order to protect plaintiff invitee against harm from armed robbers.
Plaintiff's position is that defendant, as his "business invitor," is liable for exposing him "to danger of crime and *549 resistance thereto which he foresaw." He argues the duty is accentuated because defendant was operating a "disfavored, intensely regulated but substantial nighttime enterprise past legal hours." We dispose at once of the suggestion that the character of the business as involving the sale and consumption of alcoholic beverages increased the duty of care of the proprietor in respect to the risk to invitees of harm from armed intruders. There is no perceivable relationship between the considerations which justify the exercise of the state's police power in regulations of such a business and danger to invitees therein from armed gunmen intending to rob the proprietor. Therefore the fact that the defendant was serving liquor at the bar past the legal closing hour of 2:00 A.M. has relevance to the duty here sought to be established, if at all, only to the extent that it may be thought that there is greater general risk of armed robbery late at night, and not to the violation of regulations as to the closing hour of licensed bars as such. See Daniels v. Brunton, 7 N.J. 102, 107, 108 (1951); cf. Evers v. Davis, 86 N.J.L. 196, 204 (E. & A. 1914).
Plaintiff places his right of protection by the defendant squarely upon his status as a business invitee, and we proceed upon that assumption. The proprietor of premises to which the public is invited for the business purposes of the proprietor owes a duty of reasonable care to see that those who enter the premises upon that invitation have a reasonably safe place to do that which is within the scope of the invitation. Brody v. Albert Lifson & Sons, 17 N.J. 383, 389 (1955); Bohn v. Hudson & Manhattan Ry. Co., 16 N.J. 180, 185 (1954). The measure of care has also been described as "due care under all the circumstances." 2 Harper and James, Law of Torts (1956), § 27.12, p. 1487; see Latzoni v. City of Garfield, 22 N.J. 84, 92 (1956). The conventional classifications of degrees of care owing by land occupiers to different kinds of visitors are undergoing erosion in the law in favor of a broadening application of the general tort obligation to exercise reasonable care against foreseeable harm to others, the status of the defendant as a land occupier *550 and of the visitors as invitees, licensees or trespassers tending merely to be regarded as circumstances going to the existence of due care. See 2 Harper and James, op. cit., supra, § 27.1, p. 1432; Cowan, "Torts," 9 Rutgers L. Rev. 157, 164 (1954); Imre v. Riegel Paper Corp., 24 N.J. 438 (1957); Mistretta v. Alessi, 45 N.J. Super. 176 (App. Div. 1957); Cropanese v. Martinez, 35 N.J. Super. 118 (App. Div. 1955).
The occupier-invitee cases broadly involve two kinds of asserted default, the condition of the premises and the activities carried on by the occupier. In such cases the hazard usually involved is that of accident to the invitee by reason of the unsafe condition or activity. We are at the moment considering the alleged default of the present defendant in not taking measures to keep armed intruders out of the premises. Here the hazard is voluntary criminal activity by a third person, rather than a condition of the premises making the ordinary use of the premises by plaintiff unsafe. Plaintiff points to the unlocked window through which the gunman inferably made entry. He argues that defendant should have had an alarm system in effect which would have automatically indicated the fact that a window or door was unlocked; and that the defendant and his employees were either negligent or ineffectual in keeping out armed intruders.
The fact that the risk of harm to the plaintiff was attributable to voluntary activity of others not under the control of the defendant does not of itself preclude liability if the harm by human intervention was foreseeable and a reasonable man so situated would take precautions to prevent it. Prosser, Law of Torts (2d ed. 1955), § 32, p. 138; Restatement, Torts, § 302 (b); Kinsley v. Von Atzingen, 20 N.J. Super. 378, 382 (App. Div. 1952). This general tort rule is applicable to occupiers of land, and many cases have held such persons liable for injuries inflicted on invitees by the foreseeable misconduct of third persons. Prosser, op. cit., supra, § 75, p. 431; 2 Harper and James, op. cit., supra, § 27.12, p. 1488, n. 57. Typical examples are failing to protect against crowds and unruly patrons. See Restatement of Torts, § 348, illustrations, p. 955; Annotation, 20 *551 A.L.R.2d 8 (1951). The criminality of the activity is but one circumstance in the foreseeability of harm. Feezer and Favour, "Intervening Crime and Liability for Negligence," 24 Minn. L. Rev. 635 (1940); Note, 24 Minn. L. Rev. 666 (1940); Harpell v. Public Service Coordinated Transport, 20 N.J. 309 (1956); Lillie v. Thompson, 332 U.S. 459, 462, 68 S.Ct. 140, 92 L.Ed. 73 (1947); Atlantic Coast Line R. Co. v. Godard, 211 Ga. 373, 86 S.E.2d 311 (Sup. Ct. 1955); McLeod v. Grant County School Dist., 42 Wash.2d 316, 255 P.2d 360 (Sup. Ct. 1953); Annotation, 78 A.L.R. 471, 480 (1932); Prosser, op. cit., supra, § 32, p. 142; Restatement, Torts, § 302(b), comment (n); § 449. The leading New Jersey case is Brower v. New York Central & H.R.R. Co., 91 N.J.L. 190 (E. & A. 1918). (Defendant liable for theft by passersby of contents of wagon strewn on road after collision due to negligence in operation of train.)
But the fact that the harmful behavior of an intervening third person is criminal will ordinarily militate against its being held foreseeable. Prosser, op. cit., supra, § 32, p. 141. Compare Saracco v. Lyttle, 11 N.J. Super. 254 (App. Div. 1951), holding that one who leaves his car unlocked with the keys in the ignition is not liable for harm caused by the negligent operation of the car by a thief; and cf. Kinsley v. Von Atzingen, supra.
It must be conceded that an armed holdup of such business premises as those of this defendant is a foreseeable possibility. Any business establishment in which money of any considerable amount may be expected to be on hand is the possible subject of an attempt at robbery. The critical inquiry, however, is whether it is debatably unreasonable conduct for the proprietor of an ordinary business establishment which is normally kept open and accessible to the general public in the course of its usual business (e.g., restaurants, bars, retail stores, etc.) to fail to take security measures against the entry of an armed robber, in relation to the risk of injury to a business invitee. We have no hesitation in answering the question, as a general proposition, in the negative. The *552 inconvenience and expense of such precautions, together with the accompanying impediment to the necessary untrammeled access to the premises by customers, so far outweighs the probability of bodily harm to a business invitee from an armed robber as to make it unreasonable, in our judgment, to put the proprietor to the trouble, expense and business inconvenience of effective measures to keep the criminal out. There may, of course, be kinds of businesses so attractive to armed gunmen, either because of their nature (banks, etc.) or because in other respects or particular circumstances presenting good robbery risks, as to reasonably require security measures for the protection of invitees. We are here concerned only with the situation before us.
Generally the determination of what constitutes reasonable care in a given factual context is the function of the jury, but the courts will not permit a person to be required to take a precaution which is clearly unreasonable. 2 Harper and James, op. cit., supra, § 15.3, p. 881; § 16.10, p. 937. The real significance of general terms like "negligence" and "reasonable care" emerges only against the background of a specific set of facts and circumstances. Gentile v. Public Service Coordinated Transport, 12 N.J. Super. 45, 51 (App. Div. 1951). The law of negligence does not prohibit the creation of all risks, even appreciable ones  it generally requires only that the standard of conduct required or enjoined be not unreasonable in relation to the nature of the risk. Bohn v. Hudson & Manhattan Ry. Co., supra. The Restatement of Torts, declares that the law balances the magnitude of the risk of harm against the utility of the actor's conduct, §§ 291, 292, 293. See Spalt v. Eaton, 118 N.J.L. 327, 333 (Sup. Ct. 1937), affirmed 119 N.J.L. 343 (E. & A. 1938); Halpern v. Barbara Holding Corp., 5 N.J. Super. 87, 90 (App. Div. 1949).
The only case cited to us which, in principle, approaches the specific problem as to the duty of a business invitor to protect his invitees against the danger of intrusion by armed robbers is Altepeter v. Virgil State Bank, 345 Ill. App. 585, 104 N.E.2d 334 (App. Ct. 1952). Here the court affirmed *553 a judgment on the pleadings in favor of the defendant where the plaintiff had been shot by an armed robber engaged in holding up the defendant bank, plaintiff being in the premises on business. It was held that the mere assertion of a duty on the part of the defendant to exercise a high degree of care for plaintiff's safety as a customer and to see to it that the premises should be a safe place to transact business with the bank did not state a cause of action. It was held that no facts were stated from which it could be concluded that the defendant failed to take sufficient precautions to safeguard the person of the plaintiff from injury on its premises. The court also implied that in the absence of any facts indicating that defendant's knowledge of the probability or possibility of such a robbery was superior to that of the plaintiff, the perils of such a contingency were within the equal knowledge of both parties and not to be held peculiarly foreseeable by defendant, so as to make it liable to the plaintiff in the particular case (104 N.E.2d at page 340). The court cited Restatement of Torts, § 348, which declares that
"a public utility or other possessor of land who holds it out to the public for entry for his business purposes is subject to liability to members of the public while upon the land for such a purpose for bodily harm caused to them by the accidental, negligent or intentionally harmful acts of third persons if the possessor by the exercise of reasonable care could have (2) discovered that such acts were being done or were about to be done, and (b) protected the members of the public by * * * controlling the conduct of the third persons * * *."
The provision was apparently deemed not applicable for lack of foreseeability by the defendant of the criminal act.
In several cases there has been collateral concern with the question as to whether the negligent failure of a non-occupier of premises to leave the premises secure after entry in the absence of the owner would create liability to the owner for losses from thieves who were thus enabled to enter. Jesse French Piano & Organ Co. v. Phelps, 47 Tex. Civ. App. 385, 105 S.W. 225, 227 (Civ. App. 1907) (theft of articles from a house is a "natural, reasonable, and probable" consequence *554 of the door being left open by defendant); but see Strong v. Granite Furniture Co., 77 Utah 292, 294 P. 303, 78 A.L.R. 465 (Sup. Ct. 1930); Southwestern Bell Tel. Co. v. Adams, 199 Ark. 254, 133 S.W.2d 867 (Sup. Ct. 1939). This question does not, of course, concern us here, except by way of contrast with the hazard involved in the present case. While plaintiff argues that defendant's customary practices with respect to securing the premises at night were with a view to excluding armed robbers and protecting patrons, this is not a fair inference from the testimony. The premises were customarily locked up after all customers had left, and the only legitimate inference is that this was to guard against sneak thieves, not against armed gunmen bent on holding up the proprietor or any people who might be found in the premises, at gunpoint.
Although we do not consider that any duty normally exists on the part of the proprietor of a business to take measures to keep armed robbers off the premises in relation to the risk of harm to business invitees, yet, as suggested above, special circumstances may be envisaged in which such a duty might arise from the extraordinary likelihood of felonious intrusion in the particular fact situation presented. Plaintiff argues that this is such a case, citing the lateness of the hour, the fact that the doors were already locked against admission to strangers, and knowledge by the defendant of the generally increasing incidence of crime. We do not regard the lateness of the hour as determinative. Defendant was still conducting business in the bar in the normal fashion although the legal closing hour had passed. Plaintiff claims he was still a business invitee at the time and must consequently accept the corollary that defendant was still doing business at that hour. The front door was locked only to prevent any further influx of new business that night, not to bar armed robbers. This building was frequently open for bowling business until 4:00 A.M., and occasionally as late as 6:00 A.M. The hour was therefore not relatively late for business invitees to be on the premises. The lights in the bowling alley were still on, there was also a light *555 in the bar, and there were cars parked outside. The evidence is that this establishment had never been subjected to armed robbery before and there is therefore no particular significance in defendant's knowledge that there was a general increase in armed criminality in the community, at least where not shown to have risen to an extraordinary degree.
It is consequently our considered opinion that the proofs did not make for a jury question as to the existence of a duty owing by the defendant to the plaintiff to secure him from bodily harm at the hands of gunmen by taking measures to exclude such intruders from the premises at the time of the illegal entry here involved. As to this phase of the case, then, we do not reach the question as to whether a factual causal connection has been sufficiently shown between the failure to secure the premises and the actual entry, see McCappin v. Park Capitol Corp., 42 N.J. Super. 169 (App. Div. 1956); Panglorne v. Weiss, 86 N.J.L. 286 (E. & A. 1914), nor as to whether there is an absence of showing of proximate connection between the asserted negligence and the eventual injury in any other respect.

III.
We next approach what we consider the more difficult question as to the sufficiency of the evidence to establish a case of negligence for the jury in respect to defendant's conduct after the gunman made his entry and up to the shooting of the plaintiff.
In this phase of the case it is necessary to carefully distinguish between substantive duty and the sufficiency of the evidence to create a jury question as to default in any such duty. We must arrive at conclusions as to the existence and scope of the duty before we can undertake the appraisal of the proofs in connection with the second question.
The problem inspires a return to the fundamentals of tort duty set forth in the classic exposition in Heaven v. Pender, [1883] 11 Q.B. 503, 509, recently quoted in Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29 (1958):
*556 "whenever one person is placed by circumstances in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."
Plaintiff's position is that after the entry of the gunman it was defendant's duty to plaintiff and his other invitees to refrain from any conduct reasonably calculated, intentionally or otherwise, to incite, encourage or otherwise to have the effect of inducing or increasing the likelihood of resistance to the bandit on the part of any of those present, because such activity would involve an unreasonable risk of grave injury or death to such invitees.
As we have already observed, the reasonableness in law of a defendant's behavior in a given context depends not only on the degree of risk of harm to others created or increased by his conduct but also upon the "utility" of the actor's conduct. Restatement, Torts, § 291. The latter element, in turn, is analyzed by the Restatement as including (a) the social value which the law attaches to the interest protected by defendant's conduct, (b) the extent of the chance that the interest will be advanced or protected by such conduct, and (c) the extent of the chance that the interest can be adequately protected by a less dangerous course (§ 292). There is no quantitative or other formula by which these criteria can be made to supply a ready answer to the specific question here at hand. As stated by Judge Learned Hand in Conway v. O'Brien, 111 F.2d 611, 612 (2 Cir. 1940), reversed in another connection, 312 U.S. 492, 61 S.Ct. 634, 85 L.Ed. 969 (1941), a solution in terms of the application of the foregoing factors "always involves some preference, or choice between incommensurables, and it is consigned to a jury because their decision is thought most likely to accord with commonly accepted standards, real or fancied."
In the present case, assuming the hypothesis that defendant's conduct had the effect of increasing appreciably the risk of serious injury or death to persons on the premises by gunfire, there may be advanced as justification in terms *557 of social utility the protection of the defendant's property from robbery and the vindication of society's interest in frustration of crime. Do these factors so outweigh the risks of life and limb in the scale of social desiderata as to warrant extending immunity to the defendant as a matter of law? A Texas court has seemingly answered this question in the affirmative. Helms v. Harris, 281 S.W.2d 770 (Tex. Civ. App. 1955). It was there stated by way of dictum that if a storekeeper being held up at gunpoint resisted a gunman, and a customer were wounded by gunshot as a result, there would be no liability on the part of the storekeeper to the customer, as the action of the storekeeper would be in exercise of the right of self-defense or defense of one's property. The logic of this position is weakened, however, by the concession by the court that there may be liability if the defense of property is undertaken in circumstances involving a realized unreasonable risk of harm to innocent third parties (at page 772).
Weighing additionally on defendant's side in the evaluation of duty is the possibility that the nature of the situation in which he was projected by the armed intrusion was one of emergency. This would become less relevant, however, if the fact-finder concluded that there was purposeful activity by the defendant designed to entrap the gunman. If that thesis were rejected and his responsibility weighed on the basis of negligent rather than intentional promotion of resistance to or frustration of the bandit, and if the fact-finder concluded that defendant was placed in a position allowing little time or opportunity for reasoned thought or judgment and had necessarily acted largely upon impulse or instinct, there might be no liability. Prosser, op. cit., supra; § 32, p. 137; Dobrow v. Hertz, 125 N.J.L. 347, 349 (E. & A. 1940); Wagner v. International R. Co., 232 N.Y. 176, 177, 133 N.E. 437, 438, 19 A.L.R. 1 (Ct. App. 1921). The choice of action "may be mistaken and yet prudent," Kane v. Worcester Consol. St. R. Co., 182 Mass. 201, 65 N.E. 54 (Sup. Jud. Ct. 1902, Holmes, C.J.). But see Harpell v. Public Service Coordinated Transport, supra (20 N.J. at *558 page 317). This consideration controlled the decision in favor of the defendant in Noll v. Marian, 347 Pa. 213, 32 A.2d 18 (Sup. Ct. 1943), where plaintiff, a depositor in defendant's bank, was standing at a teller's cage and was hit by gunfire from a robber shooting at a teller who had dropped behind the counter in disregard of a command not to move. Cf. Laidlaw v. Sage, 158 N.Y. 73, 52 N.E. 679, 44 L.R.A. 216 (Ct. App. 1899); Sinn v. Farmers' Deposit Sav. Bank, 300 Pa. 85, 150 A. 163 (Sup. Ct. 1930) (where a customer of defendant bank was held entitled to recover for failure of warning that nearby crank had just threatened to dynamite the place); Fulfer v. Sherry's Liquor Stores, 149 P.2d 734 (Cal. D. Ct. App. 1944).
Our review of the authorities leads us to the conclusion that the seriousness of the risk of grave injury or death inherent in the confrontation of the group of men in defendant's company by the armed robber was such that there cannot be said to have been any right on defendant's part as a matter of law to take any measures he might choose to frustrate the gunman and secure his capture without regard to the effect of such actions on the safety of the others present. The social utility of such objectives was for the consideration of the jury in forming an over-all judgment as to whether what they concluded the defendant had done or caused to be done constituted reasonable conduct, in the light of all the circumstances, including the hazards to which defendant's companions were exposed. The value of human life and of the interest of the individual in freedom from serious bodily injury weigh sufficiently heavily in the judicial scales to preclude a determination as a matter of law that they may be disregarded simply because the defendant's activity serves to frustrate the successful accomplishment of a felonious act and to save his property from loss.
In the foregoing discussion we have assumed that the evidence was sufficient to permit the jury to draw such factual inferences as would warrant its concluding that defendant's behavior constituted unreasonable conduct in light of the duty found to be owing. We must now consider defendant's *559 argument that such factual inferences and consequential conclusion were not sufficiently supported evidentially to warrant submitting the issues to a jury.
There is no direct evidence in this case that defendant induced, encouraged or persuaded Aversano to take the step which eventuated in his own death and Genovay's injury. Plaintiff argues, however, that the circumstances justify the inferences that defendant's actions were designed or reasonably foreseeably calculated in effect to influence any of the group who might see an opportunity to disarm or capture the bandit to launch such an effort, in which the others would join, and that Aversano's action and Genovay's rescue attempt were natural and expectable results of defendant's behavior. The most critical issue in this case is whether the proofs raise a reasonably debatable question as to the validity of such inferences. If so, the question was for the jury. If not, the result at the trial should stand.
The Supreme Court has recently stated that "circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as `a mere preponderance of probabilities, and, therefore, a sufficient basis for decision'" (citing Jackson v. Delaware, L. & W.R.R. Co., 111 N.J.L. 487 (E. & A. 1933)). Joseph v. Passaic Hospital Ass'n, 26 N.J. 557, 574 (1958). "[I]t need not have the quality of certainty, but it must be a presumption grounded in reason and logic; mere guess or conjecture cannot be substituted for legal proof. * * * The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion." Ibid., 26 N.J. at page 575. These admonitions, of course, are not to be applied to our own direct reactions to the evidence, but stand as the criteria for the guidance of the fact-finders, if they are permitted to function; and our own appellate responsibility is strictly confined to determining whether fair minds could reasonably debatably draw the inferences requisite to liability consistently with the general precepts stated, so as to call for delegation of the issues to the jury. Normally, when the existence of negligence depends upon the conclusion *560 to be drawn from a variety and combination of circumstances considered in their relation to and their reaction upon each other, the jury and not the court is the proper tribunal to draw the conclusion. Fagan v. Central R.R. Co., 94 N.J.L. 454, 457 (E. & A. 1920). We think this is that kind of case.
We do not agree with plaintiff in his assessment of culpability of any of defendant's actions prior to the arrival of the assemblage in the office where the safe was kept. The antecedent circumstances are, however, significant, in foreshadowing the tension which might be found to have pervaded all of the group, particularly after the escape of two of the men, and the psychological predisposition for what eventuated. As indicated above, the defendant knew there was danger of an attempt by some of the group to disarm the gunman. The remarks of Vogler, Agabiti and Aversano to the gunman indicated the cockiness of the group in the face of the bandit's two guns and further flagged the danger.
If each of the actions of the defendant in the office is analyzed separately from the others, it may plausibly be explained as consistent with due care. The first failure to open the safe could have been inadvertent or under stress of excitement; the placing of the box of money across the room on the closet, because there was no more convenient place to lay it down; the suggestion that the gunman take the remaining cash from the safe himself because it would have been inconvenient for defendant to scoop up any petty cash and proffer it to the bandit. But the combination of all of these events dilutes the probability of the hypothesis of prudence in these actions and increases the persuasiveness of the theory of a plan for apprehending the bandit. Cf. Rourke v. Hershock, 3 N.J. 422, 425, 426 (1950). The missing of the combination of the safe delayed the proceedings and tended to increase the tension, already mounting because of the imminence of the arrival of the police. If the gunman had gone across the room for the money on the closet, or had stepped between the safe doors for the remaining money, as he was invited by defendant to do, he would have been surrounded and vulnerable to concerted attack by the nine *561 others in the small room. We are persuaded that a jury could not unreasonably have found, from all the facts and circumstances, that defendant's acts were designed to communicate to the others the availability of that recourse if the gunman took or began to take either of these steps. If not designed, a jury was free to find that these actions were dangerously imprudent as probably suggesting such action to the others. "The assessment of conduct is ordinarily a factual function * * *," Taneian v. Meghrigian, 15 N.J. 267, 283 (1954). Whether defendant's actions were the excusable result of an emergent situation was also, we think, for the jury. Harpell v. Public Service Coordinated Transport, supra (20 N.J. at page 317).

IV.
We are further of the view that the momentary hesitation of the gunman in determining his next step after defendant's last suggestion, or in meeting the problem of the placement of the money box, may have reasonably been found by the jury to have prompted Aversano to seize upon it as a propitious opportunity to catch the bandit unawares by a sudden assault. Or it may have properly concluded that defendant's actions provided the encouragement and incitement which either directly induced Aversano's seizure of the initiative or resolved any uncertainty in his mind as to whether he should do so. Any of these hypotheses would have sufficed to supply the necessary causal bridge in fact between defendant's impugned behavior and the unfortunate outcome of the affair.

V.
We next consider the specific basis for the dismissal stated by the trial judge  absence of proximate cause. The court considered the actions of Aversano and the plaintiff as independent intervening causes of plaintiff's injuries. If there was an actual break in the chain of causation in fact *562 between defendant's actions in the office and Aversano's direct precipitation of the catastrophic outcome of the affair, defendant would not be liable, even if negligent. But we have already held that the evidence permitted a finding that defendant's actions encouraged, induced or created a propitious setting for an attempt to disarm the bandit. While there is evidence of a predisposition on the part of the group, generally, to essay the move, defendant is not exculpated on the basis of proximate cause by the fact that his conduct was only one of several independently contributing causative factors of the injurious occurrence. In this regard, so long as the negligent act is a substantial factor in bringing about the injuries complained of, liability may be found. Hartman v. City of Brigantine, 42 N.J. Super. 247, 261 (App. Div. 1956), affirmed 23 N.J. 530 (1957); Lutz v. Westwood Transp. Co., 31 N.J. Super. 285, 289 (App. Div. 1954), certification denied 16 N.J. 205 (1954). We are satisfied that the jury could have here found from the evidence that defendant's behavior did contribute causally, and substantially, in respect of other potential causative factors, to plaintiff's injury. Cf. Martin v. Bengue, Inc., supra (25 N.J. at page 374).
Defendant's alternative basis for advancing lack of proximate cause as a block to recovery is that it was not foreseeable that the premises would be subject to armed robbery or that Aversano would attack the gunman. Preliminarily, we pause to contribute our concurrence in the increasingly accepted view that foreseeability in the negligence field is more appropriately allocable to the sphere of definition of duty than to that of proximate cause. Mitchell v. Friedman, 11 N.J. Super. 344, 347, 348 (App. Div. 1951); 2 Harper and James, op. cit., supra, § 20.5, p. 1137; Restatement, Torts, § 433 (1948 Supp.). See the comprehensive collection of the authorities in Glaser v. Hackensack Water Company, 49 N.J. Super. 591 (App. Div. 1958). To have to apply the foreseeability criterion twice in any given case, once for testing the existence of scope of duty, and again to meet the supposed requirements of the rule of proximate *563 cause, is unwarrantably duplicative and conceptually confusing. 2 Harper and James, ubi. cit., supra.
In any event, the foreseeability of a holdup is not relevant in the present inquiry, as the measure of defendant's duty, in the light of our stated conclusions as to liability, began when the holdup became an established fact. As to the incidence of Aversano's action as an expectable sequel of defendant's conduct, we have already indicated why we think a finding of the likelihood of some such result of the existing atmosphere and defendant's actions was well within the supportive scope of the proofs. It is, of course, fundamental that the tortfeasor need not have anticipated the very occurrence which resulted so long as it can be said that the injury was the natural and probable consequence of the wrongful act and that it was foreseeable that harm of some kind might befall the plaintiff. Hartman v. City of Brigantine, supra (42 N.J. Super. at page 262). That test is fully met in this case.
As to plaintiff's personal intervention in the fracas, it is clear that if we accept the evidence as permitting the conclusion of negligence in the defendant causally contributive to Aversano's action, liability would also extend to plaintiff's injury as the result of the foreseeable evocation by Aversano's plight of the instinct of rescue in the plaintiff. Cafone v. Spiniello Construction Co., 42 N.J. Super. 590 (App. Div. 1956); Wagner v. International Railway Co., supra. Defendant has argued that the plaintiff's projection of himself into the affray was so imprudent and wanton as to amount to assumption of risk and contributory negligence. We think these issues were for the jury, under the proofs.

VI.
Plaintiff contends there was reversible error in the exclusion at the trial of a statement made to him by the defendant at the hospital the day after the shooting in which defendant thanked plaintiff for his actions and said he knew *564 they had saved others from being killed. We notice the point in view of the impending retrial of the case.
Plaintiff's argument as to the relevancy of the statement is based on his added theory of defendant's supposed breach of duty in not having gone to the assistance of Aversano and plaintiff after the latter were embroiled with the gunman. We have not hitherto mentioned that theory. We regard it as totally without merit. The danger of such a course is so obvious that it could not reasonably be imposed on the defendant as a duty. Consequently the statement was irrelevant as a claimed admission and its exclusion was not error.
Reversed and remanded for a new trial.