72 N.J. Super. 73 (1962)
178 A.2d 29
LOUIS F. RAYMOND, PLAINTIFF-APPELLANT,
v.
JOHN S. CREGAR, BENJAMIN P. DEWITT, RICHARD B. EVANS, PHILIP H. CONDIT, THOMAS C. RICHARDS, ELWOOD M. HILL, JAMES A. MacART, CALVIN A. AGAR, JR., LESLIE L. BLAU, JOHN P. COFFIN, JOHN R. DESIDERIO, FERDINAND C. DINGE, HERBERT S. GAY, JR., MERVIN H. GOLDSMITH, LEROY M. GRIGGS, CHARLES A. HEISS, JOHN E. JUDSON, JAMES L. MAC WHITHEY, WILLIAM M. McCONNELL, AUGUST MERZ, ANTHONY P. MIELE, MRS. ARTHUR G. PILCH, ARTHUR T. PRESCOTT, MRS. MARGERY E. RAAB, LESLIE C. RICKETTS, M. RAYMOND RILEY, ROBERT F. ROH, M.D., GORDON V. STODDARD, M.D., THOMAS W. SWEENEY, HARRY A. TAYLOR, ADELBERT B. TWITCHELL, M.D., GUSTAVE E. WIEDENMAYER, EDWARD H. WILLAN, M.D., MRS. ROY V. WRIGHT, WILLIAM G. WRIGHTSON, JR., AND THE EAST ORANGE GENERAL HOSPITAL, A CORPORATION OF N.J., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1961.
Decided January 22, 1962.
*75 Before Judges PRICE, SULLIVAN and LEONARD.
Mr. Thomas L. Parsonnet argued the cause for appellant (Mr. George Duggan, attorney).
Mr. Everett M. Scherer argued the cause for respondents (Messrs. Riker, Danzig, Marsh & Scherer, attorneys for respondent Richard B. Evans; Mr. Scherer, of counsel; Mr. Dickinson R. Debevoise, on the brief; Mr. Louis Ogust, attorney for all respondents except Richard B. Evans).
Mr. Woodruff J. English argued the cause for New Jersey Hospital Association, permitted by court order to participate (Messrs. McCarter & English, attorneys; Mr. English, of counsel).
*76 The opinion of the court was delivered by PRICE, S.J.A.D.
Plaintiff appeals from a summary judgment entered on defendant's motion (R.R. 4:58-2), dismissing with prejudice plaintiff's complaint in the Superior Court, Law Division.
The motion for summary judgment was considered and resolved by the trial court on the basis of the pleadings, affidavits, depositions and answers to interrogatories. Following service of the aforesaid motion the New Jersey Hospital Association (representing 127 hospitals in the State) was, by order of the trial court permitted to participate in the proceedings to the extent of presenting its view with reference to the supervisory authority of the board of trustees of a private hospital and the privileged nature of communications among the hospital officers, trustees and medical staff members. Defendants named in the various counts of the five-count amended complaint were the East Orange General Hospital, all of the individual members of its board of trustees, Dr. John S. Cregar, a physician on the medical staff of the hospital, Benjamin P. DeWitt, president of the hospital, and Richard B. Evans, a board member.
The first count of the amended complaint sought compensatory and punitive damages against defendants Cregar, DeWitt and Evans on the allegation that they had slandered plaintiff. Although the dismissal of this count was originally challenged in plaintiff's notice of appeal, his "Statement of Questions Involved" limits the appeal to the issue whether the record presented "facts sufficient * * * to justify a denial of the defendants' motion for summary judgment" on the "Second, Fourth and Fifth counts" of the amended complaint, and his brief iterates the same limitation.
The second count, also seeking both compensatory and punitive damages, charged that the aforesaid three defendants, individually, as well as in concert and as part of a conspiracy, acted maliciously to "interfere with and obstruct *77 the orderly and customary promotions of plaintiff" while a member of the hospital's medical staff, and, by circulating "false * * * rumors * * * and defamatory statements * * * did cause plaintiff's appointment to the * * * Medical Staff to be revoked," prevented "plaintiff's reappointment thereto for the years 1958 and 1959 and did maliciously interfere with and meddle with plaintiff's surgical privileges" at the hospital, "all for the malicious purpose of ruining plaintiff and interfering with the plaintiff in his profession * * *."
By the third count of the complaint plaintiff sought compensatory and punitive damages against all of the hospital trustees, individually, on the allegation that they "did actively join" the conspiracy (charged in the second count against the three defendants named therein) to "ruin" plaintiff, to "interfere" with his professional "relationships," to "injure" his "reputation" and, activated by "evil, malicious and wrongful intent," did "remove" plaintiff from the hospital's medical staff and refuse to "reappoint" him thereto. The trial court's dismissal of the third count was not made the subject of appeal by plaintiff.
By the fourth count plaintiff sought compensatory damages against the officers and members of the hospital's board of trustees on the basis of an allegation that they were individually responsible for the hospital's alleged violations of portions of the bylaws governing the hospital's medical staff, and the hospital's own bylaws concerning reappointments to that staff.
By the fifth count compensatory damages against the defendant hospital were demanded based on its alleged violation of the same portions of the aforesaid bylaws.
Plaintiff's entire action stemmed from the fact that he failed of reappointment to the medical staff of the hospital in the years 1958 and 1959. Such failure, he charged, was due to the aforesaid illegal and unlawful acts of defendants.
The material presented to the trial judge on the motion for summary judgment revealed that plaintiff had been *78 admitted to the practice of medicine in New Jersey in 1949. He had specialized in ophthalmology, in which he had received post-graduate training. He served his internship at the defendant hospital in 1948-1949, and his residency there in 1949-1950; he was admitted to the medical courtesy staff of the hospital in 1950; was granted unrestricted surgical privileges in 1951, with the exception of the requirement that he associate himself "with some of the eye surgeons" in his "first cases"; and in 1952 became a member of the active medical staff of the defendant hospital, continuing as such until 1958. However, in June 1957, on a general reorganization of surgical privileges in the hospital, plaintiff was granted full privileges in ophthalmology subject to the requirement that there be a "full attending" physician assisting him. Further reference to this action is hereinafter made. In 1958, as aforesaid, plaintiff was not reappointed to the hospital's medical staff.

CLAIM FOR DAMAGES AGAINST THE HOSPITAL FOR ALLEGED BREACH OF CONTRACT.

(Fifth count of the amended complaint)
We shall initially consider the propriety of the trial court's action in granting a summary judgment in favor of the hospital on the fifth count of the amended complaint. That count alleged that in 1958 the hospital "revoked plaintiff's appointment" to the "Medical Staff" and "refused to reappoint" him to said staff "for the years 1958 and 1959"; that such acts "were in violation of the By-Laws governing appointments and reappointments to said Medical Staff which said By-Laws constitute a contract between plaintiff and defendant." Because thereof, plaintiff charged, his property rights were violated, his reputation and the practice of his profession were injured, and he suffered "mental anguish and pain," for all of which he sought money damages on the basis of an alleged breach of contract between him and the hospital.
*79 Preliminarily, it is to be noted that there was no evidence whatever that plaintiff's appointment was "revoked." He simply was not reappointed for the year 1958 or appointed in 1959. Although the fifth count of the amended complaint did not specify in what respect the bylaws were breached, plaintiff rested his demand for damages on that count on the claim that the failure of the hospital to reappoint him was accomplished without prior conference between the board of trustees and the medical board of the hospital.
We turn to the pertinent provisions of the bylaws of the hospital and the bylaws governing the medical staff as they existed at the period in question. Article IV, section 1, of the hospital bylaws provided as follows:
"The board of Trustees shall have the general superintendence and control of the affairs of the Hospital and shall have authority to make, adopt and amend such rules and regulations as shall be deemed expedient for its conduct. They shall appoint annually in January a staff of physicians and surgeons and from time to time such officers and employees as may be necessary."
Article III, section 3, of the bylaws governing the medical staff contained the following provision:
"Appointment to the Medical Staff shall be made by the Board of Trustees and shall be for a period of one year or until the next succeeding annual meeting of the Board of Trustees, whichever is earlier. The Board of Trustees at its annual meeting in each year may make reappointments to the Medical Staff for a further period of one year or until the next succeeding annual meeting of the Board of Trustees, whichever is earlier, except in cases where the Medical Board, constituted as hereinafter provided, has recommended that reappointments shall not be made. If the Board of Trustees decides not to reappoint any member, whether or not recommended by the Medical Board, the Board of Trustees shall so advise the Medical Board.
In no case shall the Board of Trustees appoint a recommended applicant, cancel an appointment previously made, or refuse to renew an appointment without conferring with the Medical Board."
The "Medical Board" above mentioned is described in the medical staff bylaws as the "governing body" of the *80 staff, and provision for the board's creation and continuance is made by article VII of the staff bylaws.
Plaintiff's contention that the hospital had no right under the latter portion of the above quoted section 3 of the medical staff bylaws to refrain from reappointing him "without conferring with the Medical Board" is challenged by the hospital, which asserts that such interpretation is not warranted.
Admittedly no such conference was held. The trial court made no specific reference to the alleged necessity of such a conference as a condition precedent to non-reappointment of plaintiff. However, in its oral disposition of the motion for summary judgment at the conclusion of the argument thereof, the court held that "the board of trustees has followed that bylaw to the letter * * *, and since that is so there can be no cause of action predicated on that." The court later filed a "memorandum" supplementing the aforesaid oral opinion but made no reference in the memorandum to the fourth or fifth counts. We, therefore, do not have the benefit of the trial court's analysis of the factual situation surrounding the action of the trustees or its reasoning leading it to the aforesaid conclusion that there had been no breach of the bylaw in question.
To resolve the oppugnant interpretations of the aforesaid bylaw it is well to note the practical relationship existing between the hospital, the medical staff and the medical board, as well as the functioning of the various committees in this particular area, leading to the annual appointments to the hospital's medical staff. The principal committees in question are the Agar Clinic Committee, the Surgical and Obstetrical Committee, the Executive Committee and the Joint Conference Committee. More particular reference to those committees is hereinafter made in connection with our consideration of other phases of the instant suit. However, in relation to the alleged breach of the aforesaid bylaw, it uncontrovertibly appears from the proofs submitted on the motion for summary judgment that the *81 recommendations for the annual appointments to the medical staff (both original appointments and reappointments) stem from preliminary study, analysis and review by one or more of the above committees, the results of which are reported to the medical board and are channeled annually through the medium of that board's recommendations to the board of trustees. In the latter body is vested the ultimate and exclusive authority for the appointments of physicians and surgeons to the hospital staff.
Although the procedure to be followed is delineated in the bylaws, the trustees' sole authority to make the annual appointments and reappointments is unlimited and untrammeled. It is abundantly clear from the record that no doctor appointed to the staff had any vested right to membership-continuance from year to year.
The procedure followed was clearly expressed by Dr. John Harmon Wilson, a long time surgeon-member of the hospital staff, during the course of his deposition:
"Q. As far as the granting of an extension of an existing appointment, from your experience and your knowledge, just generally tell me what is the procedure for extending these re-appointments? A. Inasmuch as our hospital is a private hospital and our Board of Trustees has the privilege of appointing or not appointing a member, each year they automatically will send us a letter and announce whether they have decided to allow us to continue for the following year or not. They have that privilege. And therefore each year we are notified whether our status is the same or whether we have been dropped or whether we have been appointed for the next year.
Q. You are notified by whom? The Board of Trustees? A. Yes, the secretary of the Board of Trustees, I believe, is the one who sends us out this notification, and we receive that each year.
Q. That is after the annual meeting of the Board of Trustees: is that correct? A. That's correct."
In referring to preliminary study by the Surgical and Obstetrical Committee, of which he was a member, with reference to appointments of surgeons to the staff, Dr. Wilson graphically described the role of that committee:
*82 "* * * We are the watchdogs of the hospital along these lines, and practically all of us at some time or other are discussed in this committee one way or another. Very often we're all taken apart and analyzed in this particular committee for the good of our patients and our conduct, our behavior, our attendance at clinics, our devotion to the hospital, our general demeanor as physicians, our dedicated outlook towards them, our charitableness to those who might be destitute or near that. All of these things are analyzed and carefully discussed in this committee."
We return to the consideration of the bylaw under scrutiny. The hospital contends that the word "refuse" appearing therein furnishes clear evidence that a conference with the medical board is not required unless the board of trustees contemplates a rejection of a reappointment recommended by the medical board. The defendant hospital contends that, as was customarily done, the medical board presented to the board of trustees recommendations for appointments and reappointments to the medical staff for the year 1958 and requested confirmation thereof. The recommendations necessarily related mainly to reappointments of former members of the staff whose terms by virtue of the previous year's appointments were automatically expiring. The submitted list did not include the name of plaintiff and the name of another doctor. In approving the list at its meeting on December 30, 1957, the board of trustees simply refrained from renewing the appointment of plaintiff who was not recommended for reappointment by the medical board.
We are in accord with the defendant's aforesaid contention that the particular portion of the bylaw under scrutiny relates only to a situation where the medical board recommends the renewal of an appointment and the board of trustees elects to reject the recommendation. Adoption of plaintiff's interpretation of the bylaw would require that we ignore the use of the word "refuse" and interpret the by-law as if, instead of that word, either the words "refrain from renewing," or "abstain from renewing" an appointment had been used.
Plaintiff's interpretation of the bylaw is expressed in his brief as follows:
*83 "It will be noted that the first paragraph of Section 3 of the By-Laws does not provide for any recommendation from the Medical Board for renewal of appointments; it provides only for recommendations that re-appointments shall not be made.
Thus, Section 3 does not contemplate that the Medical Board will recommend the making of re-appointments. Instead, it contemplates that reappointments are automatically considered by the Board of Trustees as being in accord with the recommendations of the Medical Board, unless the Medical Board otherwise advises.
It is therefore clear that the Medical Board does not recommend re-appointments but in this connection recommends only a refusal to re-appoint. Thus, the second paragraph of Section 3, dealing with `refusal to renew an appointment' is directed only to cases where the Board of Trustees, either on its own motion or on the recommendation of the Medical Board, desires to refuse a re-appointment. Only in such cases is the conference with the Medical Board required."
There is no justification in the record before us for plaintiff's aforesaid assertion that the bylaw "contemplates that re-appointments are automatically considered by the Board of Trustees as being in accord with the recommendations of the Medical Board, unless the Medical Board otherwise advises." The proofs submitted to the trial court are replete with evidence that there is nothing "automatic" about the care with which the medical board, as such, annually prepares its list for submission to the board of trustees, and nothing "automatic" about the latter board's annual decision as to medical staff membership. The proofs demonstrate that the two boards recognize that a solemn duty is involved in every phase of such annual selection, a duty, the effects of the performance of which are widespread, encompassing not only the interests of the hospital and of the individual members of the medical staff, but of the patients and community at large. The above quoted portion of Dr. Wilson's deposition is typical of expressions by other witnesses and parties contained in the voluminous depositions presented to the trial court.
We have no doubt that section 3 of the staff bylaws encompasses instances in which the medical board will make recommendations for reappointments and cases in which no *84 such recommendation will be made. Read in context, as must be done, the latter portion of the section, we hold, can have reference only to rejection of reappointments recommended by the medical board. The use of the word "refuse" in the aforesaid bylaw envisions rejection of a medical board's reccommendation for reappointment of a doctor and is invoked only in those cases in which, for reasons deemed adequate by the board of trustees, that body believes that a proposed recommendation for reappointment should be rejected. So interpreted, the omission of a conference between the two boards cannot avail plaintiff.
Plaintiff asserts that the case of Joseph v. Passaic Hospital Ass'n, 26 N.J. 557 (1958) "is directly in point and controlling." We find it clearly distinguishable from the case at bar. There the hospital bylaw allegedly breached required that before a doctor "fails of reappointment" to the "active Medical Staff," he "shall be given an opportunity to be heard by the Board of Governors if he so desires." (Joseph, at p. 567). He sought that opportunity but it was not accorded to him.
Plaintiff, in the case at bar, stresses the holding in Joseph (26 N.J., at p. 569), that "those bound together in the common enterprise have reciprocal rights and duties laid down in the Constitution and By-laws and such as are inherent in the nature of the undertaking; and judicial interposition may be had to avert unreason and unconscionable and excessive action, such as would offend against natural justice." He further emphasizes the statements in Joseph, at p. 570, that "We are not now concerned with the general rule invoked by defendants that the exclusion of a physician from practice in a `private hospital' rests `within the discretion of the managing authorities.' The action taken here is null for want of a hearing in accordance with the Association's basic law."
Appellant argues that the joint board conference referred to in the aforesaid bylaw "takes the place of the hearing required by the By-Laws in the Joseph case with respect to *85 which the Supreme Court said: `The requirement of a hearing before "a man fails of reappointment" is quite clearly intended to protect the staff member against arbitrary, capricious and oppressive action * * *.' [Joseph, at p. 568]." We disagree, for, as above noted, the bylaws in Joseph are essentially dissimilar from those in the instant case and our aforesaid conclusion as to the meaning and function of the bylaw in the case at bar leads to a denial of plaintiff's contention that there was any contractual breach thereof.
Moreover, in connection with our consideration of the fifth count of the complaint, there is a further legal, and equally cogent, reason for granting the defendant hospital's motion for a summary judgment on that count. Plaintiff's amended complaint did not seek reinstatement to the staff, or an order of the court compelling the hospital trustees and medical board to confer with reference to the non-reappointment of plaintiff as a member of the staff or an adjudication that, because of the failure to hold such a conference, plaintiff should continue as such staff member. On the contrary, plaintiff's sole demand in the fifth count is that the hospital should pay him compensatory damages because a joint board conference was not held.
In Joseph, supra, it is to be noted that plantiff's counsel specifically eschewed any intention of seeking damages against the defendant hospital. He said at trial (Joseph, at p. 573): "`I am not suing the hospital association for damages,'" and the appellate tribunal said that such "seemed to be his position on the oral argument, although it is argued on the brief that `illegal removal' and `failure of reappointment' entitled plaintiff to damages from the Association itself for breach of contract." The court added (at p. 573): "But such is not the issue made by the action at law."
In the case at bar, however, as above noted, that is the precise remedy which plaintiff seeks against the hospital. Because thereof it is essential that we determine whether, *86 arguendo, adopting plaintiff's interpretation of the bylaw that the failure to hold a joint board conference constituted a breach of the bylaw, he may maintain the action for compensatory damages here asserted against the hospital. We hold that he may not do so. No damages can be determined to flow from the specific breach asserted  the failure to hold the formal conference described.
In Weiss v. Revenue B. & L. Ass'n, 116 N.J.L. 208, 210 (E. & A. 1936), quoted with approval in Cohen v. Wozniak, 16 N.J. Super. 510, 512-513 (Ch. Div. 1951), the court said:
"* * * The injured party is entitled to the value of the contract to him. * * * But this general rule is subject to two qualifications designed to confine within reasonable limits the appraisement of the consequences of the default, viz.: First, the damages shall be those arising naturally, i.e., according to the usual course of things, from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as the probable result of the breach; and, second, they must be the reasonably certain and definite consequences of the breach, as distinguished from mere quantitative uncertainty. * * *" (Emphasis supplied)
The same principle was expressed in Oliver v. Autographic Register Co., 126 N.J. Eq. 18, 24 (Ch. 1939), in the following language:
"Defendant, however, insists that inasmuch as the damages involved are contingent and speculative, they cannot be made the basis of recovery. The fallacy of this contention, however, lies in the fact that it is founded upon a false premise and an erroneous conception of the rule relating to uncertainty of damages. That rule is directed merely against uncertainty as to cause rather than uncertainty as to the measure or extent of the damage. If it is uncertain whether the defendant's act caused any damage or whether any damage resulted therefrom, then there can be no recovery of such uncertain damages. But where the uncertainty affects merely the measure or extent of the injury suffered by the aggrieved party, it does not bar a recovery." (Emphasis supplied)
See also, Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J. Super. 476, 481-482 (App. Div. 1958).
*87 Plaintiff's argument that the failure of reappointment to the staff resulted in damage to him misses the crucial point involved. Plaintiff ignores the fact that the damages claimed must be the "reasonably certain and definite consequences of the" specific breach here asserted  the failure to have a joint board conference. It cannot be assumed that such a conference would have resulted in plaintiff's reappointment and consequently the omission of such a meeting cannot be the basis for a money judgment. The judgment in favor of the hospital on the fifth count is affirmed.

CLAIM FOR DAMAGES AGAINST THE TRUSTEES, INDIVIDUALLY, FOR BREACH OF CONTRACT.

(Fourth count of the amended complaint)
Preliminarily it is to be noted that under the fourth count plaintiff sought damages against members of the board of trustees in their individual capacities, basing his claim on the same alleged breach of contract asserted in the fifth count heretofore discussed. He included as defendants in the fourth count over 30 trustees, some of whom were not in office in the year 1957, and some of whom were not at the aforesaid meeting of December 30, 1957. He also named as a defendant a former mayor of the city of East Orange, who, by virtue of that office, was an ex officio member of the board.
In addition to the reasons which we determined, as aforesaid, justified an affirmance of the summary judgment in favor of the hospital on the fifth count (which we find equally controlling with reference to the fourth count), there is no more justification for a judgment for damages against the individual trustees under the facts here presented than there would be for the entry of a judgment against the directors of a private corporation. Frank Rizzo, Inc., v. Alatsas, 27 N.J. 400, 402 (1958); Leeds v. Harrison, *88 7 N.J. Super. 558, 570 (Ch. Div. 1950). The judgment in favor of the defendants on the fourth count is affirmed.

CLAIM AGAINST DEFENDANT EVANS FOR ALLEGED MALICIOUS INTERFERENCE WITH PLAINTIFF'S PROFESSION AND STATUS AT THE DEFENDANT HOSPITAL.

(Second count of the amended complaint)
As above noted, plaintiff in the second count sought both punitive and compensatory damages against defendant Evans on the basis of a charge that individually, as well as in concert with defendants DeWitt and Cregar, he maliciously interfered with plaintiff in the practice of his profession and specifically with reference to plaintiff's status at the hospital.
We find no evidence whatever on which a claim that defendant Evans, vice-president of the board of trustees, participated in a conspiracy could be made to rest. However, both in his brief and oral argument plaintiff's counsel stressed the fact that plaintiff had also charged Evans, DeWitt and Cregar, individually, with the alleged malicious interference aforesaid.
We proceed to examine the proofs on which plaintiff relies in seeking to reverse the trial court's action in granting summary judgment in favor of Evans individually. Interpreting the proofs in a light most favorable to the plaintiff, and drawing all legitimate inferences in his favor, as we are obliged to do in assessing the propriety of the trial court's action in granting the motion for summary judgment (Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954)), we note that plaintiff claims that the criticized acts of Evans had their genesis in professional treatment which plaintiff had rendered to the mother of defendant Evans during the early months of 1957. Plaintiff charges that he sent a bill to the defendant *89 Evans for services rendered the latter's mother; that Evans considered that the bill was excessive and so stated to plaintiff and also told plaintiff that he (Evans) had discussed the bill with defendant Cregar, who "had agreed that the bill was excessive." Plaintiff further stated that Evans told him in telephone conversations during May and June 1957 that his (plaintiff's) position on the medical staff at the hospital "was in jeopardy" and that defendant Cregar had stated that plaintiff "was very troublesome." Proofs disclose that as a matter of fact the bill as rendered was later substantially reduced by plaintiff. There is nothing contained in the record on that phase of the case which would justify a claim that Evans had maliciously interfered with plaintiff's profession.
With further reference to the professional services rendered by plaintiff to the mother of defendant Evans, plaintiff points to the deposition of Dr. Alphonse L. Cantelmo, a member of the medical staff and of the medical board at the time in question. The witness therein stated that at a Joint Conference Committee meeting on July 9, 1957, defendant Evans said that plaintiff advised that an operation be performed on defendant's mother. Plaintiff denied that he had ever recommended surgery in the case in question. Examination of the record shows that defendant Evans, referring to the committee meeting in question, gave the following testimony on deposition:
"Q. Did you have any discussion whatsoever with Dr. Raymond concerning an operation on your mother's eyes? A. Oh, yes. During the examination the question came up of cataracts. This discussion wasn't new to me. Every examination she'd go through, then and since, that question has come up as to whether perhaps surgical treatment would improve her vision. I forgot just what Dr. Raymond said, but I assumed he said about the same thing every other ophthalmologist has  that is, that surgery would not improve the situation. I don't recall exactly what he said at that time.
Q. In other words, you have no recollection of Dr. Raymond advising an operation on your mother's eyes? A. No.
Q. Did you bring to anybody's attention at the East Orange General Hospital your opinion that the bill was excessive? A. No."
*90 Certainly this evidence furnishes no justification for a claim, such as plaintiff asserts in the second count, warranting recovery of damages against defendant Evans. The judgment in his favor on that count is affirmed.

CLAIM AGAINST DEFENDANT DEWITT FOR ALLEGED INTERFERENCE WITH PLAINTIFF'S PROFESSION AND STATUS AT DEFENDANT HOSPITAL.

(Second count of the amended complaint)
Defendant DeWitt, at the time in question, was president of the board of trustees of the hospital and by virtue of such office was an ex officio member of the various committees.
Our aforesaid comment with reference to the allegation of conspiracy against Evans applies with equal force to DeWitt. The proofs submitted are devoid of any basis for a claim that DeWitt participated in any conspiracy.
Turning to the individual claim against DeWitt, we find that it is centered in a statement allegedly made by him near the termination of a meeting of the Joint Conference Committee held in October 1958. The meeting occurred many months after the board of trustees had failed to reappoint plaintiff to the medical staff. Plaintiff had requested permission to appear before the Joint Conference Committee with reference to the fact that he had failed of reappointment. He was accompanied by his lawyer. According to the proofs, they were advised that the board of trustees' action as to the 1958 appointments was final and that the board was not obliged nor would it furnish plaintiff with any detailed statement of the reasons for his failure to be reappointed. Plaintiff and his lawyer then left the meeting and, according to plaintiff's testimony, presented in deposition form, plaintiff returned an hour later to the vicinity of the room where the meeting was being held and, by standing near the closed door of the room, allegedly heard a board member ask a question about *91 him. Plaintiff then proceeded in his deposition to give the following testimony:
"Q. Who did you hear saying what? A. * * * Exactly what she [a board member] said, I don't remember; except I heard my name mentioned. And several things that didn't impress me too much at the time, so I wouldn't remember. And after a little while, I heard Mr. DeWitt tell them about this, that he had secret information in the file that would do me more harm than what had already transpired at this particular moment."
There is nothing in the foregoing testimony, relating to a statement allegedly made under the aforesaid circumstances months after the meeting at which plaintiff failed of reappointment, which would justify an action for damages against DeWitt for malicious interference with plaintiff's profession. The trial court properly granted a motion for summary judgment in his favor.

CLAIM AGAINST DEFENDANT CREGAR FOR ALLEGED MALICIOUS INTERFERENCE WITH PLAINTIFF'S PROFESSION AND STATUS AT THE DEFENDANT HOSPITAL.

(Second count of the amended complaint)
In our analysis of the proofs the evidence as above stated must be viewed as mandated by Judson, supra. So considered, the record reveals the following:
At the time of the events herein related, defendant Cregar was the only senior attending physician in the Ophthalmology Department of the hospital and the only ophthalmologist on the Surgical and Obstetrical Committee of the hospital. On a number of occasions during 1956 and 1957, plaintiff allegedly objected to defendant Cregar that Dr. Meineke "was not appointed as full attending" in violation of Article VI, section 1, of the medical staff bylaws requiring a senior attending surgeon or physician in charge of each service in the clinical departments. *92 (There were two such services in the Ophthalmology Department.) Plaintiff apparently believed that such appointment of Dr. Meineke might result in plaintiff's promotion to the status of associate attending surgeon.
Cregar admitted on deposition that plaintiff questioned him about the absence of a second full attending ophthalmologist although he denied remembering any reference to Dr. Meineke. He was aware, however, that plaintiff sought promotion. Plaintiff indicated on affidavit that Cregar informed him that one of the reasons Dr. Meineke had not been appointed was that he (Cregar) "`had to be the king pin in the Eye Department.'"
Two affidavits submitted by plaintiff purport to reveal defendant Cregar's attitude towards him. A student nurse at the hospital in 1957, Jane Rissland, deposed that "Cregar manifested a very critical and unfriendly attitude towards plaintiff"; that several times in her presence he examined charts of plaintiff's patients and threw them down "with a look of disgust"; that at other times when looking at charts of plaintiff's patients he said: "`Did you see that?'" or "`Look what they are doing now' in a sarcastic tone of voice"; and, that on one occasion when plaintiff had admitted "a young boy patient" to the hospital, Cregar "stated that it was a shame for the Doctor too [sic] keep the youngster in the hospital."
One Venanzio Longo deposed that prior to plaintiff's failure of reappointment, he overheard Cregar state on several occasions that plaintiff "was no good as a doctor." Other statements attributed to Cregar by the aforesaid affiant were "that plaintiff, Dr. Raymond was stealing his patients, that he was using quack remedies and was charging high fees." Cregar, he said, indicated "that he was going to stop plaintiff * * * from bringing patients into the hospital" and in 1959 expressed the opinion that plaintiff "deserved what we gave him at the hospital," and that he "was never a good doctor and charged excessive fees."
Although originally intended as supportive of the abandoned *93 count alleging slander, the last two mentioned affidavits are relevant in reviewing the trial court's action in granting summary judgment on the count charging Cregar's alleged malicious interference with plaintiff's profession. In this aspect, the affidavits are evidential for purposes of the motion as allegedly demonstrative of defendant Cregar's state of mind.
In September 1951 plaintiff was granted unrestricted surgical privileges at the hospital with the limitation that in his first cases he associate himself with an experienced eye surgeon. Then, in June 1957, he was notified that pursuant to a revision of the classification of surgical privileges, he was required to have a "full attending in assistance." Defendant Cregar was the only ophthalmologist on the medical staff with the status of "full attending [senior]."
The minutes of the June 13, 1957 meeting of the Surgical and Obstetrical Committee reveal that Cregar "spoke about the surgical privilege in the eye department and the arrangement was satisfactorily tabulated by the surgical committee and these eye privileges" were to be mailed to the respective doctors.
Dr. Wilson testified on deposition that at one meeting of the Surgical and Obstetrical Committee, the date of which he could not remember, defendant Cregar reported "that he felt that Dr. Raymond should continue to be supervised by one of the senior attendings who  senior attending ophthalmologists who had good surgical training and who should guide him." The influence of defendant Cregar upon the decision of the Surgical and Obstetrical Committee to restrict plaintiff's surgical privileges was described as follows by Dr. Wilson:
"Being a specialized field entirely out of our field, Dr. Cregar was in a class by himself different from the rest of us in that none of us ever touched the eye or have anything to do with it, and we felt that Dr. Cregar was reporting on his own little kingdom, so to speak, and of really not very much interest to us." *94 According to Dr. Wilson, the reliance placed upon Cregar's opinion was absolute, as revealed by the following question and answer:
"Q. Was this the decision of the Surgical Committee itself or Dr. Cregar? A. Well, we naturally accepted Dr. Cregar's recommendation, as head of the eye department, because we had no knowledge of what the eye men were doing. So that we had to accept that, and we had to put it down that way to make it conform with our other privileges."
Dr. Wilson further stated that in July 1957, when the committee reconsidered plaintiff's surgical privileges at plaintiff's request, its judgment was "based on the information that" it had been "given by the eye department."
Significantly, the record before us discloses no apparent basis upon which defendant Cregar could have judged plaintiff's surgical competence. In plaintiff's affidavit which was submitted to the trial court in opposition to the motion for summary judgment, Cregar's answer to a supplementary interrogatory is quoted as follows: "`* * * I have never seen Dr. Raymond operate and can give no opinion as to his ability or dexterity.'" Also pertinent to this matter is the following interrogation of Cregar on deposition:
"Q. Was Dr. Raymond assigned to the Ophthalmological Department at the East Orange General Hospital? A. Yes.
Q. Was he assigned to that after he completed his internship, do you know? A. Yes.
Q. Did he work with you in the Ophthalmological Department? A. What do you mean by that?
Q. Did you work together? A. Never.

* * * * * * * *
Q. During the period that Dr. Raymond was at the East Orange General Hospital, did he perform his duties satisfactorily? A. From my own opinion, I have no knowledge.
Q. You have no knowledge? A. No.
Q. You know of nothing that would indicate that the doctor didn't perform his duties properly at the East Orange General Hospital? A. No personal knowledge."
The foregoing assertion of a lack of any personal knowledge by Cregar of plaintiff's performance of his duties is also pertinent in considering the latter's failure of reappointment.
*95 The minutes of the meetings of the Surgical and Obstetrical Committee during the fall of 1957 disclose that the subject of plaintiff's reappointment for the year 1958 was under discussion. During those meetings, according to the minutes, the "head of the ophthalmology department [Cregar] thought that it might be very wise not to re-appoint" plaintiff and the committee shared his view "due to" plaintiff's "conduct in the care of his patients, his unethical practices as judged by his colleagues, his suspension by the Medical Society on two different occasions and his excessive fees * * *."
Although defendant Cregar denied that he ever recommended that plaintiff not be reappointed, Dr. Robert F. Roh (a member of the Surgical and Obstetrical Committee) testified on deposition that he recalled that Cregar "thought it might be very wise not to reappoint" plaintiff. Dr. A.L. Cantelmo testified that, concerning reappointments, the head of the department can make recommendations. Dr. Alfred Meurlin stated that he "looked" to Dr. Cregar for his opinion of Dr. Raymond and remembered the former discussing plaintiff at a meeting of the Surgical and Obstetrical Committee "in the latter part of 1957." He recalled Cregar's stating that plaintiff "was remiss in his attendance at the clinic" and that he "had exceeded his surgical privileges in the operating room."
Plaintiff relied heavily on the testimony of Dr. Wilson, who in his deposition recalled considerable discussion of plaintiff by Cregar at meetings of the Surgical and Obstetrical Committee, although the witness was unable to identify the particular meetings other than that they were held during 1957. He recalled that Cregar recommended that plaintiff not be reappointed. Cregar's criticism of plaintiff, Dr. Wilson said, fell into general categories "as to the man's attendance at clinics, the man's conduct at the hospital, the man's general surgical ability and ability as an ophthalmologist, and on the man's general demeanor and conduct in the community." The charges were more specifically delineated by Dr. Wilson as follows: Cregar accused plaintiff *96 of not "practicing in accordance with the views of the ophthalmologists in" the area; of "charging very high fees"; of having "gotten into the bad graces of the Essex County Medical Society" and having been "either put on probation or suspended" because of his "excessive charges"; of not limiting the treatment of patients to his specialty; of not being "as devoted and dedicated to the hospital or the patients as he should" have been; of giving hypodermics too frequently which "was one of" the "severe criticisms"; of not being in "good standing with * * * other ophthalmologists"; and of overemphasizing "allergic conditions of the eye." Dr. Wilson's description of the last mentioned charge follows:
"He mentioned that Dr. Raymond was emphasizing in most of his treatments allergic conditions of the eye to the point where one could emphasize that over and beyond its importance as connected with the other diseases of the eye, and be rather apt to see allergy in almost all ophthalmological conditions to the point of where he felt that a man could even be considered to push that to the point of where he might be termed a charlatan or be suspicious of rather sliding in that direction * * *."
Although denying that he had ever discussed or made recommendations upon the subject of the plaintiff's reappointment, defendant Cregar testified that he had an "idea" why plaintiff was not reappointed. On deposition Cregar testified that he obtained this idea through complaints about plaintiff which were brought to his attention as head of the department. He said that there were four such types of complaints, viz., (1) plaintiff "was very remiss in his attendance to the clinic"; (2) plaintiff's "records were incomplete and, in spite of repeated notifications, he failed to complete his records"; (3) plaintiff "was not confining his admissions to the hospital to the specialty in which he was devoting himself"; and (4) plaintiff "was performing surgery in the operating room, the nature of which exceeded the privileges which had been granted him." Cregar continued that: "Any one of those was sufficient to cause the man not to be reappointed."
*97 Plaintiff testified that he performed no operations at the hospital after June 1957. In reference to the third category of complaints (above listed), other than Cregar's assertion that it constituted ground for non-reappointment, there is no specific indication that plaintiff's right to admit patients was limited to cases within his specialty.
With reference to complaints regarding plaintiff's attendance at the clinic and his allegedly incomplete records, Cregar stated that he had been informed of plaintiff's poor attendance at the clinic by Miss Helen Harrington, who was in charge of the Clinic Department. Miss Harrington testified on deposition that on two or three occasions she notified defendant Cregar that plaintiff was not present when scheduled for attendance at the clinic. A review of the attendance record by counsel during interrogation of Miss Harrington revealed, however, that plaintiff's attendance was better than that of Dr. Meineke, with whom the clinic was conducted, although the latter's absences were never brought to Cregar's attention.
Turning to the records of plaintiff's patients, Cregar testified that these records were not in order because they were incomplete. He asserted that Miss Dolores Capobianco, the medical record librarian, brought this fact to his attention. Miss Capobianco testified that she never notified Dr. Cregar or anyone else that plaintiff's records were incomplete. In fact, she found all of plaintiff's records at the hospital to be "in order on a quantitative analysis basis." (Emphasis supplied). Her testimony conflicts with Cregar's, who found plaintiff's records deficient because:
"They would vary one to the other. Some had no history, some had no diagnosis, some had no treatment, some had no follow-up notes, some had no discharge notes, some were operated on and had no description of the surgery performed."
The aforesaid cause of action, asserted by plaintiff on the second count against Cregar, has been recognized in numerous decisions in this State, including Sokolay v. Edlin, 65 N.J. *98 Super. 112 (App. Div. 1961); Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955); Louis Schlesinger Co. v. Rice, 4 N.J. 169 (1950); Strollo v. Jersey Central Power & Light Co., 20 N.J. Misc. 217, 26 A.2d 559 (Sup. Ct. 1942); Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934).
The malicious acts in the instant case are alleged to consist primarily, if not exclusively, of assertively slanderous statements made by the defendant. Plaintiff has abandoned his first count, which was for slander, presumably because the defamation action was, with the exception of one statement, barred by the statute of limitations. N.J.S. 2A:14-3.
It has been held that an action for malicious interference with one's business is not subject to the aforesaid section of the statute of limitations, even though the interference consists of the publication of defamatory matter. Strollo v. Jersey Central Power & Light Co., supra; Van Horn v. Van Horn, 56 N.J.L. 318 (E. & A. 1893). Plaintiff, thus, has stated a recognizable cause of action. Consequently, the subject of the trial court's inquiry on defendant's motion for summary judgment was the nature of the action for malicious interference with a business, i.e., the elements of the tort, and an analysis of the proofs to conclude whether a plenary trial was warranted. The elements of the tort are interference and malice or unjustifiable cause. Sokolay v. Edlin, supra, 65 N.J. Super., at p. 128; Rainier's Dairies v. Raritan Valley Farms, Inc., supra, 19 N.J., at p. 563; Louis Schlesinger Co. v. Rice, supra, 4 N.J., at p. 180. Malice or unjustifiable cause may be inferred from the character of the communication itself or from any other facts reasonably tending to prove the same. Fahr v. Hayes, 50 N.J.L. 275, 279 (Sup. Ct. 1888). The issue of malice should not be presented to the jury unless there is more than a scintilla of evidence. Jorgensen v. Pennsylvania R. Co., 25 N.J. 541, 569 (1958).
Defendant claims that the statements allegedly made by *99 him were qualifiedly privileged, i.e., made under such circumstances that the law protects the speaker unless the statements were malicious  exceeded the privilege of the occasion. Plaintiff does not challenge the privileged nature of the communications and conferences among officers, trustees, medical staff and committee members with reference to qualifications of doctors who annually are under consideration for staff membership. He maintains, however, that the privilege in the case of Dr. Cregar was "lost" because of the proofs submitted on the motion for summary judgment, from which proofs, he contends, inferences of malice may properly be drawn. Sokolay v. Edlin, supra, at p. 127; Lawless v. Muller, 99 N.J.L. 9, 12 (Sup. Ct. 1923); King v. Patterson, 49 N.J.L. 417, 419-420 (E. & A. 1887).
Our assessment of the foregoing proofs, viewed most favorably for the plaintiff (excising from our consideration all hearsay testimony contained in the material submitted to the trial court), convinces us that the summary judgment in favor of defendant Cregar should not have been entered. The proofs were such as to raise factual questions which require explanation and resolution at a plenary trial. In so holding, we are indicating no opinion as to the ultimate assessment of the proofs, on such trial, bearing on the question of Dr. Cregar's alleged malice. At this point we are simply holding that under the principles enunciated by our decisional law plaintiff is entitled to go to trial on the second count of the amended complaint as against this particular defendant individually. There is no justification in the proofs warranting a trial on plaintiff's charge that Cregar conspired with any other person.
Summary judgment in favor of defendants is affirmed except that portion of the judgment referable to the second count of the amended complaint entered in favor of defendant Cregar, individually. As to that defendant on that count, judgment is reversed and the case remanded for trial as against him.
*100 Costs are allowed against plaintiff and in favor of all of the defendants except defendant Cregar. As to defendant Cregar, costs are to abide the outcome of the trial of the action against him on the second count of the amended complaint.